# Supreme Court of Florida

_____

No. SC11-2254
_____

**SHAWN ALVIN TRACEY,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

[October 16, 2014]

LABARGA, C.J.

This case is before the Court for review of the decision of the Fourth District Court of Appeal in Tracey v. State, 69 So. 3d 992 (Fla. 4th DCA 2011). Because the district court expressly construed a provision of the United States Constitution, this Court has jurisdiction to review the decision. See art. V, § 3(b)(3), Fla. Const. For the reasons set forth below, we quash the decision of the district court in Tracey and remand for further proceedings in accordance with this opinion.

## FACTS AND BACKGROUND

Shawn Alvin Tracey was convicted by a jury of possession of more than 400 grams of cocaine, as well as fleeing and eluding, driving while his license was

revoked as a habitual offender, and resisting arrest without violence. Law enforcement learned from a confidential informant that Tracey "obtains multiple kilograms of cocaine from Broward County, for distribution on the West Coast of Florida" and that "the CS [confidential source] contacts Shawn Tracey on the listed Metro PCS telephone number." Based on these sole factual allegations, on October 23, 2007, officers obtained an order authorizing the installation of a "pen register" and "trap and trace device" as to Tracey's cell phone. A "pen register" records the telephone numbers dialed from the target telephone and a "trap and trace device" records the telephone numbers from incoming calls to the target telephone. Over a month after issuance of the October 23, 2007, order, officers learned from the confidential informant that Tracey would likely be coming to Broward County to pick up drugs for transport back to the Cape Coral area where he resided. Without obtaining an additional order or providing additional factual allegations, officers used information provided by the cell phone service provider under the October 23 order, which also included real time cell site location information given off by cell phones when calls are placed, to monitor the location of cell phones used by Tracey and an individual named Guipson Vilbon.[1] This

_____

1. Cell site location information (also referred to as CSLI) refers to location information generated when a cell phone call occurs. Cell service providers maintain a network of radio base stations called "cell sites" in different coverage areas. A cell site will detect a radio signal from a cell phone and connect it to the local network, the internet, or another wireless network. The cell phones identify

information enabled law enforcement to track Tracey's trip eastward on December 5, 2007, noting ten cell phone calls with Vilbon before Tracey arrived in Broward County.

Officers originally set up surveillance at two of Vilbon's known "stash" houses where officers believed drugs were being stored. However, after officers traced Vilbon's cell phone to a different house, surveillance was moved to that area. Officers tracked Tracey's cell phone to that same house by use of real time CSLI from his cell phone, and "were able to see that both phones were inside that location." A GMC Envoy vehicle was seen parked outside and was later seen at a nearby intersection. The Envoy was subsequently stopped and Tracey, who was driving, was arrested. A search of the Envoy uncovered a kilogram brick of cocaine hidden in the spare tire well of the vehicle. Vilbon, who was driving a

themselves by an automatic process called "registration," which occurs continuously while the cell phone is turned on regardless of whether a call is being placed. When a call is placed and the cell phone moves closer to a different cell tower, the cell phone service provider's switching system switches the call to the nearest cell tower. The location of the cell phone can be pinpointed with varying degrees of accuracy depending on the size of the geographic area served by each cell tower, and is determined by reference to data generated by cell sites pertaining to a specific cell phone. See Brian Davis, Prying Eyes: How Government Access to Third-Party Tracking Data May be Impacted by United States v. Jones, 46 New England L. Rev. 843, 848-49 (2012). CSLI cannot be disabled by the user. Jeremy H. Rothstein, Track Me Maybe: The Fourth Amendment and the Use of Cell Phone Tracking to Facilitate Arrest, 81 Fordham L. Rev. 489, 494 (2012).

vehicle in front of the Envoy, was also stopped and a search of his car turned up $23,000 in cash.

Officers obtained and used the real time cell site location information pertaining to Tracey's cell phone under the original October 23, 2007, order even though the order issued by the court concerning his cell phone authorized only a "pen register" and "trap and trace device." In the application for the order, the officers sought only to "record inbound and outbound dialed digits" based on the allegation that "attachment of a Pen Register/Trap & Trace Device would be an important investigative tool to record the inbound and outbound dialed digits from telephone facility [number], helping identify possible co-conspirators in the violation of the herein above referenced Florida State Statute." The application stated that the information to be obtained is "relevant to a Broward Sheriff's Office ongoing investigation." The application did not seek authority—or provide facts establishing probable cause—to track the location of Tracey's cell phone in either historical or real time; and the order did not ask for access to real time cell site location information. For some unexplained reason, the cell phone information given to officers did include real time cell site location information on Tracey's cell phone, which the officers then used to track him.[2]

---

2. Also for unexplained reasons, the court order entered in this case also authorized "historical Cell Site Information," citing 18 U.S.C. § 2703(d), which is part of the federal "Stored Communications Act," although the application did not

Tracey moved to suppress the evidence, which he alleged was derived from the real time cell site location information obtained from his cell phone, and contended that real time cell site location information, as distinguished from historical location information derived from cell phone records, required a warrant. Tracey contended that probable cause is required to obtain such real time location information and that the affidavit filed to support the order obtained by officers did not contain factual allegations establishing probable cause. He further contended that the officers exceeded the scope of the order they did obtain, which authorized them only to record incoming and outgoing telephone numbers. The trial court found that the application for the October 23, 2007, order did not contain a sufficient factual basis on which to issue a search warrant, but denied the motion to suppress, finding that no warrant was required to use Tracey's real time cell site location data to track him on public streets where the court held he had no expectation of privacy.

---

ask for that authorization. "To obtain records of stored electronic communications, such as a subscriber's name, address, length of subscription, and other like data, the government must secure either a warrant pursuant to Federal Rule of Criminal Procedure 41, or a court order under 18 U.S.C. § 2703(d)." In re Application of the United States for an Order Pursuant to 18 U.S.C. Section 2703(d), 707 F.3d 283, 287 (4th Cir. 2013) (citation omitted). That provision calls for issuance of an order "if the government 'offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation.' " Id.

On appeal, the Fourth District Court of Appeal affirmed, agreeing that the affidavit provided by law enforcement for issuance of the October 23, 2007, order did not provide a factual basis sufficient to support probable cause, Tracey, 69 So. 3d at 999, but held that the monitoring of Tracey's cell site location information occurred only when his vehicle was on public roads where it " 'could have been observed by the naked eye,' so no Fourth Amendment violation occurred during Tracey's journey across Florida to Fort Lauderdale." Id. at 996 (quoting United States v. Karo, 468 U.S. 705, 714 (1984)). While "acknowledg[ing] that a compelling argument can be made that CSLI falls within a legitimate expectation of privacy," Tracey, 69 So. 3d at 996, the district court concluded that "on search and seizure issues, we are bound to follow United States Supreme Court precedent in interpreting the Fourth Amendment" and "[u]nder the current state of the law expressed in [United States v. Knotts, 460 U.S. 276 (1983)] and Karo, a person's location on a public road is not subject to Fourth Amendment protection." Tracey, 69 So. 3d at 996-97.

The district court also addressed the question of violation of statutes governing electronic surveillance, stating that "[b]ecause much non-content based electronic surveillance falls outside the Fourth Amendment, most regulation of it has been by statute." Id. at 997. The district court noted that although Florida has its own electronic surveillance law, the federal electronic surveillance law

preempts the field, as recognized by this Court in <u>State v. Otte</u>, 887 So. 2d 1186, 1187-88 (Fla. 2004) (stating that the federal wiretap statute preempts the field of wiretapping and electronic surveillance and limits the state's authority to legislate in this area; although states are free to adopt more restrictive statutes, they cannot adopt less restrictive ones).

The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), is codified at 18 U.S.C. § 2510 <u>et seq</u>. Title I of the federal act[3] amended the 1968 federal wiretap statute and included provisions concerning mobile tracking devices. Title II of the federal act,[4] codified at 18 U.S.C. § 2701 <u>et seq.</u>, created a new chapter of the federal criminal code dealing with access to stored communications and transaction records. This portion of the federal statute, known as the "Stored Communications Act," authorizes government access to stored communications in the hands of third-party providers, categorizes the different types of stored information, and sets forth what the government must do to access those different types of information. Title III of the federal act,[5] codified at 18 U.S.C. §§ 3121-27, covers "pen registers" and "trap and trace" devices.

---

3. Pub. L. 99-508, Title I, § 108(a) (1986).

4. Pub. L. 99-508, Title II, § 201[a] (1986), and subsequently amended.

5. Pub L. 99-508, Title III, § 301(a) (1986), and subsequently amended.

Florida's counterpart to this federal scheme is contained in chapter 934, Florida Statutes, titled "Security of Communications." In 2007 when the order in this case was entered for installation of the pen register and trap and trace device as to Tracey's cell phone, section 934.31, Florida Statutes (2007), similar to federal law, required a court order to "install or use a pen register or a trap and trace device."[6] § 934.31(1), Fla. Stat. (2007). Section 934.33(1), Florida Statutes (2007), allowed entry of the order if the officer making the application under section 934.32, Florida Statutes (2007), certified that the information likely to be obtained by the installation and use of a pen register or trap and trace device is "relevant to an ongoing criminal investigation" by that agency. § 934.32(2)(b), Fla. Stat. (2007) (emphasis added).

Under Florida's version of the Stored Communications Act, section 934.23(4)(a), Florida Statutes (2007), allowed a law enforcement officer to require a provider of electronic communication service to disclose "a record or other information pertaining to a subscriber . . . not including the contents of a communication," when the officer, inter alia, obtains a warrant or obtains a court order for such disclosure by offering "specific and articulable facts showing that there are reasonable grounds to believe . . . the records of other information sought

_____

6. The current versions of these statutes are the same as existed in 2007.

are relevant and material to an ongoing criminal investigation."  §§ 934.23(4)(a)2. & (5), Fla. Stat. (2007) (emphasis added).

The district court in <u>Tracey</u> recognized that "[t]here is some basis in federal law to support Tracey's contention that, unlike historical CSLI, an order authorizing real time CSLI requires, as a precondition, the elevated showing of probable cause, and not the lower standard of 'specific and articulable facts.' " <u>Tracey</u>, 69 So. 3d at 999.  However, the district court recognized that there is disagreement among the courts as to the standard, and explained:

> Some courts have authorized disclosure on a showing of "specific and articulable facts" under the pen register statute and section 2703.[FN8] Other courts have required a showing of probable cause.[FN9]
>
> > FN8.  <u>E.g.</u>, <u>In re Application of the U.S. for an Order Authorizing the Use of Two Pen Register & Trap & Trace Devices</u>, 632 F. Supp. 2d 202 (E.D.N.Y. 2008); <u>In re Application of the U.S. for an Order Authorizing the Installation & Use of a Pen Register & Trap & Trace Device</u>, 411 F. Supp. 2d 678 (W.D. La. 2006); <u>In re Application of the U.S. for an Order Authorizing the Installation & Use of a Pen Register & Trap & Trace Device</u>, 433 F. Supp. 2d 804 (S.D. Tex. 2006); <u>Gorenstein opinion</u> [<u>In re App. of U.S. for an Order for Disclosure of Telecomm. Records and Authorizing the Use of a Pen Register and Trap and Trace Device</u>, 405 F. Supp. 2d 435 (S.D.N.Y. 2005)].
> >
> > FN9.  <u>E.g.</u>, <u>In re Application of the U.S. for an Order Authorizing the Use of a Pen Register</u>, 2009 WL 159187 (S.D.N.Y. 2009); <u>In re Application of the U.S. for an Order Authorizing the Disclosure of Prospective Cell Site Information</u>, 412 F. Supp. 2d 947 (E.D. Wis. 2006); <u>In re Application for an Order Authorizing the Installation and Use of a Pen Register</u>, 439 F. Supp. 2d 456 (D. Md. 2006); <u>In re Application for Pen Register &</u>

Trap & Trace Device with Cell Site Location Auth., 396 F. Supp. 2d 747 (S.D. Tex. 2005); In re Application of the U.S. for an Order Authorizing the Use of a Pen Register & Trap & Trace Device, 396 F. Supp. 2d 294 (E.D.N.Y. 2005). See also ECPA Reform and the Revolution in Location Based Tech's and Serv's: Hearing Before the Comm. On the Judiciary and Subcomm. On the Constitution, Civil Rights, and Civil Liberties, 111th Cong. 3-4, Note 1, Exh. B (2010) (statement of Stephen Wm. Smith, U.S. Magistrate Judge), available at http://judiciary.house.gov/hearings/ pdf/ Smith 100624.pdf.

Tracey, 69 So. 3d at 999 (bracketed material added). The district court did not decide which of these approaches was correct, and stated:

[T]he state failed to meet even the less stringent standard required by section 934.23(5)—the application failed to offer "specific and articulable facts" to show that CSLI was "relevant and material to an ongoing criminal investigation." In fact, the application did not even seek a court order for CSLI, only a pen register and a trap and trace.

Id. at 999-1000. Even though the district court found a violation of chapter 934 in this case, the court concluded that the exclusionary rule does not apply to prevent the State from using evidence derived from the statutory violation. Id. at 1000. This conclusion was the result of reliance in part on federal decisions that have held that the exclusionary rule is not applicable to violation of the federal Stored Communications Act because the Act expressly rules out exclusion as a remedy, by stating that the listed civil and criminal penalties are the only judicial remedies and sanctions for violation of that act. Id. The district court below concluded:

Similarly, under Florida law, the exclusionary rule is not a remedy for violations of section 934.23. Section 934.28, Florida Statutes (2009) provides:

> The remedies and sanctions described in ss. 934.21-934.27 are the only judicial remedies and sanctions for violation of those sections.

The criminal penalties of section 934.21 and the civil remedy provided in section 934.27 are the only remedies authorized for a violation of section 934.23. Application of the exclusionary rule is not an option authorized by statute.

For these reasons, the trial court correctly denied the motion to suppress, even though law enforcement relied on real time CSLI to locate Tracey without complying with Chapter 934. We affirm the judgments of conviction.

Tracey, 69 So. 3d at 1000. On the question of application of the Fourth Amendment to the use of real time CSLI, the district court held that "[s]ince it concerns the government's tracking of an individual's location on public roads, this case does not involve a Fourth Amendment violation." Id. at 995.

With this background in mind, we turn to the main question now before the Court—whether regardless of any federal or state statutory provisions, the use of real time cell site location information to track Tracey violated the Fourth Amendment because probable cause was required, but not provided, to access and use that information.[7]

---

7. Our review of a decision of a district court of appeal construing a provision of the state or federal constitution concerns a pure question of law and is, thus, de novo. See Crist v. Fla. Ass'n of Criminal Def. Lawyers, Inc., 978 So. 2d 134, 139 (Fla. 2008) (citing Fla. Dep't of Revenue v. City of Gainesville, 918 So. 2d 250, 256 (Fla. 2005)).

# ANALYSIS

We begin with one of the bedrock principles of our federal constitution, the

Fourth Amendment to the United States Constitution, which states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Amend IV, U.S. Const.[8]  Over four decades ago, the Supreme Court emphasized

the importance of fidelity to the foundational premise of the Fourth Amendment in

Coolidge v. New Hampshire, 403 U.S. 443 (1971), stating:

> [T]he most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption

---

8.  Article I, section 12, of the Florida Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated."  That same constitutional provision contains a "conformity clause" which requires that "[t]his right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court."  Thus, this Court is bound to follow the decisions of the Supreme Court but not of other federal courts.  See Smallwood v. State, 113 So. 3d 724, 730 (Fla. 2013).  " 'Any Supreme Court pronouncement factually and legally on point with the present case [will] automatically modify the law of Florida to the extent of any inconsistency.' "  Id. (emphasis added) (quoting State v. Daniel, 665 So. 2d 1040, 1047 n.10 (Fla. 1995), receded from on other grounds by Holland v. State, 696 So. 2d 757, 760 (Fla. 1997)).

. . . that the exigencies of the situation made that course imperative." "[T]he burden is on those seeking the exemption to show the need for it." In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or "extravagant" to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won—by legal and constitutional means in England, and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing everyman's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important.

Id. at 454-55 (plurality opinion) (footnotes omitted). Although these words were penned long ago, they have proved prescient now that technology has advanced to the point that our whereabouts can be ascertained easily and at low cost by the government. As the Supreme Court wisely cautioned in Coolidge, "[i]f times have changed," such as they have now that technology has provided the government with technological capabilities scarcely imagined four decades ago, the protections of the Fourth Amendment are "more, not less, important." Id. at 455. Keeping this paramount constitutional right in mind, we turn first to a discussion of pertinent United States Supreme Court precedent.

## I.  Supreme Court Precedent

The United States Supreme Court has not yet ruled on whether probable cause and a warrant are required, either under the statutory scheme or based on the Fourth Amendment, for an order requiring disclosure of real time cell site location

information to be used by law enforcement to track a subscriber's cell phone. In 1967, long before the possibility of cell phone tracking emerged, the Supreme Court decided Katz v. United States, 389 U.S. 347 (1967), in which the Court laid the groundwork for the "reasonable expectation of privacy" test which became a staple of Fourth Amendment jurisprudence. The Court in Katz held that "the Fourth Amendment protects people, not places," and concluded that attachment of an eavesdropping device to a public telephone booth violated the Fourth Amendment. Id. at 351, 361 (Harlan, J., concurring). Later Supreme Court cases applied the analysis of Justice Harlan's concurrence in Katz, which said that a Fourth Amendment violation occurs when government officers violate a person's "actual (subjective) expectation of privacy" that "society is prepared to recognize as 'reasonable.' " Id. at 361 (Harlan, J., concurring). "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy,' " and in applying the test, the Court examines whether the individual manifested a subjective expectation of privacy and whether society is willing to recognize that expectation as reasonable. California v. Ciraolo, 476 U.S. 207, 211 (1986) (citing Katz, 389 U.S. at 360 (Harlan, J., concurring)).

In Smith v. Maryland, 442 U.S. 735 (1979), the Supreme Court applied the reasonable expectation of privacy test to the question of whether the government's

- 14 -

warrantless installation and use of a pen register installed in the telephone company's offices in order to record telephone numbers dialed from Smith's telephone was a Fourth Amendment search. The pen register was used to discover that a telephone in Smith's home had been used to place a telephone call to a robbery victim who had received threatening calls. The Supreme Court held in Smith that there was no Fourth Amendment violation because Smith did not have an expectation of privacy in the telephone numbers dialed from his telephone, which were voluntarily transmitted to the telephone company. Id. at 742-44. The Court concluded that all subscribers realize that the telephone company has facilities for making permanent records of the numbers they dial, which they see on their monthly bills. Id. at 742. In addition, the Supreme Court explained:

> Consistently with Katz, this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. . . . [FN5] [citations omitted].
>
> > FN5. Situations can be imagined, of course, in which *Katz'* two-pronged inquiry would provide an inadequate index of Fourth Amendment protection. For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation of privacy regarding their homes, papers, and effects. Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy

- 15 -

> regarding the contents of his calls might be lacking as well.  <u>In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.  In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.</u>

<u>Smith</u>, 442 U.S. at 740-41 (emphases added).  The Court further held that even if Smith had an expectation of privacy in the numbers dialed from his home telephone, it was not an expectation that society was prepared to recognize as reasonable because "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."  <u>Id.</u> at 743-44.  Thus, to date, installation and use of a pen register simply to record the numbers dialed from a specific telephone is not subject to Fourth Amendment requirements.

In 1983, the Supreme Court decided <u>United States v. Knotts</u>, 460 U.S. 276 (1983), in which the Court held that the warrantless monitoring of a radio transmitter beeper located inside a container of chemicals that was carried over public roads did not violate the Fourth Amendment because the beeper did not reveal any information that could not have been discovered through visual means.  The Court noted that the officers simply augmented their sensory faculties of observation of the vehicle by use of the beeper.  <u>Id.</u> at 282.  The beeper had been placed in the container of chemicals with the consent of the former owner, before it

came into the possession of Knotts' codefendants, and ultimately ended up outside

Knotts' cabin.[9]  Id. at 281-82.  The Supreme Court in Knotts held, "A person

travelling in an automobile on public thoroughfares has no reasonable expectation

of privacy in his movements from one place to another."  Id. at 281.  However, the

holding in Knotts was not a blanket holding for all future circumstances when

electronic-type tracking occurs in public areas.  The Court specifically left open the

question of the application of the Fourth Amendment to longer term surveillance,

stating "if such dragnet-type law enforcement practices as respondent envisions

should eventually occur, there will be time enough then to determine whether

different constitutional principles may be applicable."  Id. at 284.

After Knotts, the Supreme Court made clear that warrantless tracking that

continues into a protected location violates the Fourth Amendment and evidence

arising from that search would be subject to suppression.  In United States v. Karo,

468 U.S. 705 (1984), a beeper was placed into a container that belonged to a third

party, with the consent of the then-owner.  The container did not come into

possession of the defendant until later.  The beeper was subsequently used to track

the container from a storage facility to several locations including inside a house

---

9. Knotts did not actually challenge the constitutionality of monitoring the beeper as it traveled in his codefendants' vehicles, but only "the use of the beeper insofar as it was used to determine that the can of chloroform had come to rest on his property."  Knotts, 460 U.S. at 284.

and, based in part on that information, the police secured a warrant. The Supreme Court concluded that tracking and locating the beeper in the residence prior to obtaining a warrant violated the Fourth Amendment. Id. at 719. The Court again held, "A 'search' occurs 'when an expectation of privacy that society is prepared to consider reasonable is infringed.' " Id. at 712 (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)).

The Supreme Court reaffirmed the principles stated in Katz and Karo when it decided Kyllo v. United States, 533 U.S. 27 (2001). There, the Court held that use of a thermal imaging device aimed at a private home from a public street in order to detect relative amounts of heat inside the home was an invasion of a reasonable expectation of privacy and constituted a search within the meaning of the Fourth Amendment. See Kyllo, 533 U.S. at 34-35. In so holding, the Supreme Court noted that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,' constitutes a search—at least where (as here) the technology in question is not in general public use." Id. (quoting Silverman v. United States, 365 U. S. 505, 512 (1961)).

More recently, the Supreme Court in United States v. Jones, 132 S. Ct. 945 (2012), reaffirmed the viability of the Katz "reasonable expectation of privacy" test, and also noted that it has "not deviated from the understanding that mere

visual observation does not constitute a search," as it held in <u>Knotts</u> when it stated that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." <u>Jones</u>, 132 S. Ct. at 953 (quoting <u>Knotts</u>, 460 U.S. at 281). The issue in <u>Jones</u> was not decided on either of these bases, however. Instead, the Court in <u>Jones</u> relied on an earlier trespassory test and held that the warrantless placement of a Global-Positioning-System (GPS) tracking device on the defendant's vehicle and use of it to monitor the vehicle's movements on public streets constituted a "search" under the Fourth Amendment.[10] <u>Id.</u> at 949. In deciding the case based on a trespassory theory, the Court emphasized that "the <u>Katz</u> reasonable-expectation-of-privacy test has been <u>added to</u>, not <u>substituted for</u>, the common-law trespassory test." <u>Id.</u> at 952. In addition, the Court in <u>Jones</u> made clear that the government's use of "the transmission of electronic signals without trespass would <u>remain</u> subject to <u>Katz</u> analysis." <u>Id.</u> at 953. In holding that installation of the GPS device on the defendant's vehicle to monitor and track him constituted an improper warrantless search, the Court in <u>Jones</u> cautioned that "[i]t may be that achieving the same result through electronic means, without an accompanying trespass, is an unconstitutional

---

10. In <u>Jones</u>, the government had initially obtained a warrant, valid for ten days, for the placement of the device. However, the GPS device was installed on the eleventh day. In defense of that action, the government contended that a warrant was not required. <u>Jones</u>, 132 S. Ct. at 948.

invasion of privacy, but the present case does not require us to answer that question." Jones, 132 S. Ct. at 954. Thus, that question remains open.

A similar question is now before this Court—whether the warrantless use of electronically generated cell site location information to track an individual's movements in real time both on public roads and, in this case, also into a residence, violates a subjective expectation of privacy in that person's location—and whether that expectation, if any, is one society is now prepared to recognize as objectively reasonable based on an evolving view of the meaning of privacy in the face of technological advances.

As noted above, the Supreme Court has not answered this specific question concerning tracking by use of real time cell site location information, and the lower federal courts are divided on the question presented here.

## II. Other Courts

The federal courts have held, in line with the Supreme Court, that the use of a pen register to record telephone numbers dialed from a telephone does not constitute a search for Fourth Amendment purposes. See United States v. Forrester, 512 F.3d 500, 509 (9th Cir. 2008) (citing Smith, 442 U.S. at 745-46 (holding that installation and use of a pen register that records only telephone numbers dialed, which numbers were voluntarily conveyed to the telephone company, was not a search under the Fourth Amendment)); see also Rehberg v.

Paulk, 611 F.3d 828, 843 (11th Cir. 2010) (holding that defendant lacked a legitimate expectation of privacy in phone and fax numbers dialed); United States v. Thompson, 936 F.2d 1249, 1250 (11th Cir. 1991) (holding that installation of a pen register does not constitute a search under the Fourth Amendment). Thus, the use of a pen register and trap and trace device to record outgoing and incoming telephone numbers is not presently in question and the court's order authorizing it in this case is not at issue.

Nor are historical cell site location records at issue here. However, we note that even as to "historical" cell site location information, the federal courts are in some disagreement as to whether probable cause or simply specific and articulable facts are required for authorization to access such information. Some federal courts have held that access to the category of records referred to as "historical" cell site location information, which identifies the location of the cell phone when calls were made at some time in the past based on records routinely kept by the provider, need only meet the statutory "specific and articulable facts" standard. See, e.g., In re Application of the United States for Historical Cell Site Data, 724 F.3d 600, 613 (5th Cir. 2013); United States v. Moreno-Nevarez, 2013 WL 5631017, at *2 (S.D. Cal. Oct. 2, 2013); United States v. Graham, 846 F. Supp. 2d 384, 404 (D. Md. 2012); United States v. Benford, 2010 WL 1266507, at *2-3 (N.D. Ind. Mar. 26, 2010); In re Applications of United States for Orders Pursuant

- 21 -

To Title 18, U.S. Code, Section 2703(d), 509 F. Supp. 2d 76, 81 (D. Mass. 2007); see also In re Application of the U.S. for an Order Directing a Provider of Elec. Comm'n Serv. to Disclose Records to the Gov't, 620 F.3d 304, 313, 319 (3d. Cir. 2010) (holding that the specific and articulable facts standard applies to obtain historical cell site location information, although 18 U.S.C. § 2703(d) allows the magistrate discretion, to be used "sparingly," to require probable cause and a warrant).

Other federal courts, however, have held that cell phone users have a reasonable expectation of privacy in historical cell site location records and the government's obtaining these records requires probable cause. See In re Application of United States for an Order Pursuant to 18 U.S.C. § 2703(d), 2012 WL 3260215 at *2 (S.D. Tex. July 30, 2012); In the Application of the United States for an Order Authorizing the Release of Historical Cell-Site Info., 809 F. Supp. 2d 113, 119-20 (E.D.N.Y. 2011) (regarding cumulative cell site location records); In the Application of the United States of America For and [sic] Order: (1) Authorizing the Use of a Pen Register and Trap and Trace Device; (2) Authorizing Release of Subscriber and Other Info.; and (3) Authorizing the Disclosure of Location-Based Servs., 727 F. Supp. 2d 571, 583-84 (W.D. Tex. 2010).

We emphasize, however, that it is not historical cell site location information that is at issue in this case. And, although at present the law is clear that there is no reasonable expectation of privacy in the telephone numbers dialed and captured by a pen register, the issue in flux is what standard is required for the government to access and use for tracking purposes real time cell site location information of the subject cell phone that is produced when the cell phone is in use.

Under the federal scheme, 47 U.S.C. § 1002(a)(2)(B), a provision within the "Communications Assistance for Law Enforcement Act," 47 U.S.C. §§ 1001-1100, "call-identifying information [acquired solely by pen registers and trap and trace devices] shall not include any information that may disclose the physical location of the subscriber (except to the extent that the location may be determined from the telephone number)." See 47 U.S.C. § 1002(a)(2)(B). Based on that prohibition, the federal district court in In re Application for Pen Register and Trap/Trace Device with Cell Site Location Authority, 396 F. Supp. 2d 747, 753 (S.D. Tex. 2005), held that real time cell site location information cannot be obtained through the pen register statute. That court also rejected the government's argument that the pen register statute when combined with provisions of the Stored Communications Act (SCA), an approach referred to as a "dual" or "hybrid" theory, could authorize use of real time cell site location data. Id. at 760-61. In reaching that conclusion, the federal court rejected the contention that real time cell

site location information was a "record" under the SCA.  Id. at 759.  The court

further stated that "[n]othing in the SCA contemplates a new form of ongoing

surveillance in which law enforcement uses co-opted service provider facilities."

Id. at 760.  Finally, the federal district court rejected the government's application

for real time cell site location information and noted that "[t]his type of

surveillance is unquestionably available upon a traditional probable cause showing

under Rule 41," and further cautioned that "permitting surreptitious conversion of

a cell phone into a tracking device without probable cause raises serious Fourth

Amendment concerns, especially when the phone is monitored in the home or

other places where privacy is reasonably expected."  Id. at 765.  See also In re the

Application of the United States for an Order Authorizing (1) Installation and Use

of a Pen Register and Trap and Trace Device or Process, (2) Access to Customer

Records, and (3) Cell Phone Tracking, 441 F. Supp. 2d 816, 837 (S.D. Tex. 2006)

(recognizing constitutional difficulties in dual or hybrid theory because it would

"necessarily authorize far more detailed location information, such as triangulation

and GPS data, which unquestionably implicate Fourth Amendment privacy

rights").

Other federal district courts have allowed the "hybrid" theory to authorize

access to real time cell site location information on the lesser "specific and

articulable facts"[11] standard, rather than a probable cause standard, by combining provisions of the federal pen register statute with provisions of the federal Stored Communications Act. Those courts have been described as being in the minority in allowing the "hybrid" theory to authorize access to real time cell site location information without probable cause. See United States v. Espudo, 954 F. Supp. 2d 1029, 1038-39 (S.D. Cal. Jul. 19, 2013) (noting that "[a] significant majority of courts ha[s] rejected the hybrid theory and has found that real-time cell site location data is not obtainable on a showing less than probable cause").

However, whether federal or state statutes, either individually or taken together, authorize the government to obtain real time cell site location information based on less than probable cause does not answer the question posed in this case. The question here—regardless of any authorizing statutes—is whether accessing real time cell site location information by the government in order to track a person using his cell phone is a Fourth Amendment search for which a warrant based on probable cause is required.

---

11. The "specific and articulable facts" standard has been described as "essentially a reasonable suspicion standard." See In re Application of U.S. for an Order Pursuant to 18 U.S.C. Section 2703(d), 707 F.3d at 287. The standard has also been described as requiring "a showing of a particularized and objective basis for a suspicion of criminal activity." See In re Applications of U.S. for Orders Pursuant to Title 18, U.S. Code, Section 2703(d), 509 F. Supp. 2d 76, 78 n.2.

It appears that only one federal appellate court has ruled on a similar question. The court in United States v. Skinner, 690 F.3d 772 (6th Cir. 2012), cert. denied, 133 S. Ct. 2851 (2013), held that a defendant does not have a reasonable expectation of privacy in the location data given off from his cell phone's GPS, thus no search occurred when Skinner voluntarily used his cell phone while traveling on public roads.[12] In reaching this conclusion, the Sixth Circuit cited Knotts for the proposition that Skinner did not have a reasonable expectation of privacy in the location of his cell phone while traveling on public thoroughfares. See Skinner, 690 F.3d at 778. The Sixth Circuit, again relying on Knotts, also held in United States v. Forest, 355 F.3d 942 (6th Cir. 2004), vacated on other grounds, Garner v. United States, 543 U.S. 1100 (2004), that "pinging" the defendant's cell phone to gather cell site location data did not violate the Fourth Amendment because agents could have obtained the same information by following the defendant's car. Id. at 951. Relying on Skinner, the federal district court in United States v. Ruibal, 2014 WL 357298, at *2 (W.D. Mich. Jan. 31, 2014), also held that the defendant did not have a reasonable expectation of privacy in the location

12. Judge Donald departed from the majority on this point, and opined that Skinner had a reasonable expectation of privacy in the GPS data from his cell phone and that probable cause would be required. Skinner, 690 F.3d at 784 (Donald, J., concurring in part and concurring in the judgment). Judge Donald would not suppress the evidence, however, because he concluded the officers had probable cause to search and because the purposes of the exclusionary rule would not be served. Id.

data from his cell phone. And in <u>United States v. Caraballo</u>, 963 F. Supp. 2d 341, 360 (D. Vt. 2013), that court concluded that a cell phone user "generally has no reasonable expectation of privacy in cell site information communicated for the purpose [of] making or receiving calls," although the case was resolved on the basis of exigent circumstances.

In contrast, the federal district court in <u>In re Application of the United States for an Order Authorizing Disclosure of Location Information of a Specified Wireless Telephone</u>, 849 F. Supp. 2d 526 (D. Md. 2011), held that the defendant had a reasonable expectation of privacy "both in his location as revealed by real-time location data and his movement where his location is subject to continuous tracking over an extended period of time, here thirty days." <u>Id.</u> at 539. Further, the district court noted that "as the majority of other courts that have examined this issue have found, the Fourth Amendment requires that the government must show probable cause prior to accessing such data." <u>Id.</u> at 541-42 (citing <u>In re the Application of the United States for an Order (1) Authorizing the Use of a Pen Register and a Trap and Trace Device</u>, 396 F. Supp. 2d 294, 323 (E.D.N.Y. 2005) ("Because the government cannot demonstrate that cell site tracking could never under any circumstance implicate Fourth Amendment privacy rights, there is no reason to treat cell phone tracking differently from other forms of tracking . . . which routinely require probable cause.")). The federal district court in Maryland

expressed concern over the very real risk that, because cell phone users tend to take their phones with them everywhere, officers could not know in advance whether the tracking would follow the suspect into clearly protected areas.  See In re Application of the United States, etc., 849 F. Supp. 2d at 540.  It is true that neither law enforcement officers monitoring real time cell site location information nor a court issuing an order for access to such information on a standard lower than probable cause can know at the time whether the cell phone and the person using it will be tracked into places that would, without doubt, be protected under the Fourth Amendment.

The divergence of views among the courts as to whether probable cause is required to obtain real time cell site location information, and the problems that can arise in this type of tracking, were succinctly explained by the Superior Court of Massachusetts in Commonwealth v. Pitt, 2012 WL 927095 (Mass. Super. Ct. Feb. 23, 2012), in which that court also discussed the problem of determining only after the fact whether real time cell site location tracking constituted a search:

> The first line of cases holds that whether use of CSLI requires a warrant depends on whether the location information revealed a cell phone user's location in a public area.  Hewing closely to the distinction between the use of beeper surveillance in Karo versus the use of that surveillance in Knotts, these courts have emphasized that the Fourth Amendment offers strong protection to homes and other locations withdrawn from public view, but that a citizen has no expectation of privacy in information concerning his location in a public place.  Therefore, under this line of cases, the government is free to obtain CSLI without a warrant, but if it does so, any

> information about a cell phone user's location in his home or a similar location withdrawn from public view will be subject to suppression.
>
> The second line of cases holds that CSLI represents a serious encroachment on the Fourth Amendment rights of citizens. Indeed, in some ways, the use of CSLI represents a truly unprecedented incursion into cell phone users' privacy interests. Recognizing the invasive nature of this type of surveillance, this line of cases requires the government to obtain a warrant before making use of CSLI. On balance, this court concludes that this line of reasoning offers the closest fidelity to the purpose and spirit of the Fourth Amendment.

Id. at *6 (emphases added). The Massachusetts court concluded it would be "incongruous to decide the constitutionality of a search post hoc based on the information it produced." Id. at *7. "[T]he Fourth Amendment's warrant requirement cannot protect citizens' privacy if a court determines whether a warrant is required only after the search has occurred, and the incursion into a citizen's private affairs has already taken place." Id. This concern—which we share—is but one consideration that bears on our determination of the issue presented here.

### III. Other Considerations Pertinent to This Case

Emphasizing that the Fourth Amendment is not concerned only with searches that are accomplished by trespass onto property, Justice Sotomayor in her concurrence in Jones reiterated that the Fourth Amendment also protects against violation of "subjective expectations of privacy that society recognizes as reasonable." Jones, 132 S. Ct. at 954 (Sotomayor, J., concurring) (quoting Kyllo, 533 U.S. at 33). She agreed with Justice Alito's observation that the same

- 29 -

technological advances that have made possible nontrespassory surveillance techniques will affect the <u>Katz</u> "reasonable-expectation-of-privacy" test, shaping the evolution of societal privacy expectations.  <u>Id.</u> at 955.  Although referring to GPS monitoring in the <u>Jones</u> case, Justice Sotomayor focused on the fact that electronic monitoring of a citizen's location can generate a comprehensive record of a person's public movements by monitoring trips to places that the individual may wish to keep private, such as "the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue, or church, the gay bar and on and on."  <u>Id.</u> (Sotomayor, J., concurring) (quoting <u>People v. Weaver</u>, 909 N.E. 2d 1195, 1199 (N.Y. 2009)).

Justice Sotomayor also noted that, in the past, such extensive tracking and monitoring required substantial government time and resources, which acted as a check on abusive law enforcement practices; but with the ease of electronic tracking and monitoring, those checks no longer exist.  <u>Jones</u>, 132 S. Ct. at 956 (Sotomayor, J., concurring).  Justice Sotomayor raised a valid concern, which we share, that such monitoring, which can be accomplished at a relatively low cost and can compile a substantial quantum of information about any person whom the government chooses to track, may " 'alter the relationship between citizen and government in a way that is inimical to democratic society.' "  <u>Id.</u> (quoting <u>United</u>

States v. Cuevas-Perez, 640 F. 3d 272, 285 (7th Cir. 2011) (Flaum, J., concurring)).  Also, as Justice Sotomayor concluded, these considerations should now be taken into account in determining the "existence of a reasonable societal expectation of privacy" regardless of whether the government "might obtain the fruits of GPS monitoring through lawful conventional surveillance."  Jones, 132 S. Ct. at 956.  All of these concerns and conclusions about GPS tracking also apply to tracking and monitoring by use of real time cell site location information.

For similar reasons, Justice Sotomayor opined that it might be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties, which she believes is an "approach [] ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks."  Id. at 957.  She expressed doubt in the premise that disclosure of certain facts to a company for a limited purpose requires an assumption that the information may or will be released to other persons for other purposes.  Id.  She aptly noted, "[W]hatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy.  I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection."  Id.

Justice Alito, in his concurrence in <u>Jones</u> in which Justices Ginsburg, Breyer, and Kagan concurred, opined that the Court's resolution of the <u>Jones</u> case based on a trespass theory rather than a reasonable-expectation-of-privacy basis "strains the language of the Fourth Amendment" and has little support in current Fourth Amendment case law. <u>Jones</u>, 132 S. Ct. at 958 (Alito, J., concurring). He would resolve the issue on the basis of whether the defendant's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove. <u>Id.</u> Justice Sotomayor, on the other hand, would find that "even short-term monitoring" was problematic in that it "generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations" that can be stored and mined for information "years into the future." <u>Id.</u> at 956. (Sotomayor, J., concurring). Further, she noted that "[a]wareness that the Government may be watching chills associational and expressive freedoms." <u>Id.</u>

The theory that discrete acts of surveillance by law enforcement may be lawful in isolation, but may otherwise infringe on reasonable expectations of privacy in the aggregate because they "paint an 'intimate picture' of a defendant's life," has been referred to as the "mosaic" theory. <u>United States v. Wilford</u>, 961 F.

Supp. 2d 740, 771 (D. Md. 2013).[13] The court in <u>Wilford</u> noted that the "mosaic"

theory has presented problems in practice, citing <u>United States v. Graham</u>, 846

F. Supp. 2d 384, 401 (D. Md. 2012), in which the court found the "mosaic" theory

to be problematic where traditional surveillance becomes a search only after some

specified period of time.

We agree, and conclude that basing the determination as to whether

warrantless real time cell site location tracking violates the Fourth Amendment on

the length of the time the cell phone is monitored is not a workable analysis. It

requires case-by-case, after-the-fact, ad hoc determinations whether the length of

the monitoring crossed the threshold of the Fourth Amendment in each case

challenged. The Supreme Court has warned against such an ad hoc analysis on a

case-by-case basis, stating, "Nor would a case-by-case approach provide a

workable accommodation between the needs of law enforcement and the interests

protected by the Fourth Amendment." <u>Oliver v. United States</u>, 466 U.S. 170, 181

(1984). The Court in <u>Oliver</u> listed substantial precedent in which the Supreme

Court "repeatedly has acknowledged the difficulties created for courts, police, and

citizens by an ad hoc, case-by-case definition of the Fourth Amendment standards

---

13. <u>Wilford</u>, 961 F. Supp. 2d at 771 (quoting <u>United States v. Graham</u>, 846 F. Supp. 2d 384, 401-03 (D. Md. 2012) (quoting <u>United States v. Maynard</u>, 615 F.3d 544, 562 (D.C. Cir. 2010), <u>aff'd on other grounds sub nom</u> <u>United States v. Jones</u>, 132 S. Ct. 945 (2012))).

to be applied in differing factual circumstances," with a primary difficulty being "a danger that constitutional rights will be arbitrarily and inequitably enforced." Id. at 181-82. In a different context, in holding that a warrant is generally required to search the contents of a cell phone taken from an arrestee, the United States Supreme Court reiterated in Riley v. California, 134 S. Ct. 2473 (2014), that " '[I]f police are to have workable rules, the balancing of the competing interests . . . "must in large part be done on a categorical basis—not in an ad hoc, case–by-case fashion by individual police officers." ' " Id. at 2491-92 (quoting Michigan v. Summers, 452 U.S. 692, 705 n.19 (1981) (quoting Dunaway v. New York, 442 U.S. 200, 219-20 (1979) White, J., concurring)).

Ad hoc, after-the-fact determination of whether real time cell site location monitoring constituted a Fourth Amendment violation presents this same danger of arbitrary and inequitable enforcement. Nor can we avoid this danger by setting forth a chart designating how many hours or days of monitoring may be conducted without crossing the threshold of the Fourth Amendment. In fact, this approach was rejected by the majority in Jones, when the Supreme Court stated:

> There is no precedent for the proposition that whether a search has occurred depends on the nature of the crime being investigated. And even accepting that novelty, it remains unexplained why a 4-week investigation is "surely" too long and why a drug-trafficking conspiracy involving substantial amounts of cash and narcotics is not an "extraordinary offens[e]" which may permit longer observation. See post, at 964. What of a 2-day monitoring of a suspected purveyor of stolen electronics? Or of a 6-month monitoring of a suspected

- 34 -

> terrorist? We may have to grapple with these "vexing problems" in some future case where a classic trespassory search is not involved and resort must be had to <u>Katz</u> analysis; but there is no reason for rushing forward to resolve them here.

<u>Jones</u>, 132 S. Ct. at 954.

Justice Alito also recognized in his concurrence that "technology can change [well-developed and stable privacy] expectations," and that "technological change may lead to periods in which popular expectations are in flux and may ultimately produce significant changes in popular attitudes." <u>Id.</u> at 962 (Alito, J., concurring). Notwithstanding this prospect, he stated, "In circumstances involving dramatic technological change, the best solution to privacy concerns may be legislative." <u>Id.</u> at 964. However, Justice Alito recognized that Congress and most states have not enacted statutes regulating GPS tracking for law enforcement purposes (nor has Florida enacted laws specifically concerning GPS or real time cell site location information tracking for law enforcement purposes). And Justice Sotomayor expressed some doubt in "the appropriateness of entrusting to the Executive, in the absence of any oversight from a coordinate branch, a tool so amenable to misuse, especially in light of the Fourth Amendment's goal to curb arbitrary exercises of police power to and prevent 'a too permeating police surveillance.' " <u>Id.</u> at 956 (Sotomayor, J., concurring) (quoting <u>United States v. Di Re</u>, 332 U.S. 581, 595 (1948)).

The majority in Jones decided the case based on the physical trespass by which the GPS tracking device was installed on the defendant's vehicle, not on the Katz reasonable-expectation-of-privacy test; thus, the concerns and questions raised by the concurring Justices were not answered in that case. Regardless, they present considerations that are relevant to our determination of whether access to real time cell site location information, which can be and was used in this case to track Tracey's movements, requires a statement of facts establishing probable cause in advance of the tracking, rather than determining after the fact that probable cause was required based on the conduct of or the timeframe of the tracking. The concerns expressed in Jones by Justice Sotomayor in her concurrence and by Justices Alito, Ginsburg, Breyer, and Kagan, who concurred in the judgment, raise serious issues about electronic tracking that is now easily and cheaply available to the government—issues that we are loath to ignore.

James Madison, the principal author of the Bill of Rights, is reported to have observed, "Since the general civilization of mankind, I believe there are more instances of the abridgement of freedom of the people by gradual and silent encroachments by those in power than by violent and sudden usurpations." See Klayman v. Obama, 957 F. Supp. 2d 1, 42 & n.67 (D. D.C. 2013) (citing James Madison, Speech in the Virginia Ratifying Convention on Control of the Military (June 16, 1788), in The History Of The Virginia Federal Convention Of 1788,

With Some Account Of Eminent Virginians Of That Era Who Were Members Of The Body (Vol.1) 130 (Hugh Blair Grigsby et al. eds., 1890)).[14]  Indeed, the ease with which the government, armed with current and ever-expanding technology, can now monitor and track our cell phones, and thus ourselves, with minimal expenditure of funds and manpower, is just the type of "gradual and silent encroachment" into the very details of our lives that we as a society must be vigilant to prevent.

Simply because the cell phone user knows or should know that his cell phone gives off signals that enable the service provider to detect its location for call routing purposes, and which enable cell phone applications to operate for navigation, weather reporting, and other purposes, does not mean that the user is consenting to use of that location information by third parties for any other

_____

14.  In Klayman, the federal district court for the District of Columbia found that telecommunications subscribers had demonstrated a significant likelihood that they would prevail on the merits in a case alleging that the federal government's wholesale collection of telephony metadata of all United States citizens under the National Security Agency Bulk Telephony Metadata Program, pursuant to the Foreign Intelligence Surveillance Act of 1978, § 501, 50 U.S.C. § 1861, violated the Fourth Amendment.  See Klayman, 957 F. Supp 2d at 37.  Klayman stated, "Just as the Court in Knotts did not address the kind of surveillance used to track Jones, the Court in Smith was not confronted with the NSA's Bulk Telephony Metadata Program.  Nor could the Court in 1979 have ever imagined how the citizens of 2013 would interact with their phones."  Id. at 32 (footnote omitted).  But c.f. American Civil Liberties Union v. Clapper, 959 F. Supp. 2d 724, 752 (S.D.N.Y. 2013) (finding same metadata collection program constitutional based on the holding in Smith, 442 U.S. at 744-45, that a subscriber has no legitimate expectation of privacy in telephony metadata created by third parties.).

unrelated purposes. While a person may voluntarily convey personal information to a business or other entity for personal purposes, such disclosure cannot reasonably be considered to be disclosure for all purposes to third parties not involved in that transaction. See, e.g., In re Application of the U.S. for an Order Directing a Provider of Elec. Commc'ns Serv. to Disclose Records to the Gov't, 620 F.3d at 317 (concluding that a cell phone customer does not "voluntarily" share his location information with the service provider in any meaningful way). The Supreme Court in Ciraolo reiterated that " '[t]he test of legitimacy is not whether the individual chooses to conceal assertedly "private" activity,' but instead 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.' " 476 U.S. at 212 (quoting Oliver, 466 U.S. at 182-83). Although the Supreme Court made this pronouncement in regard to Fourth Amendment claims in the context of searches of an open field and the curtilage of a residence, the principle as stated is also applicable to our analysis here. The Supreme Court, in stating this principle, has clearly recognized protection of "personal and societal values" regarding expectations of privacy that a society is willing to recognize even where such activities are not fully concealed.

It is true that a cell phone user can prevent locational signals from being used for tracking purposes by turning off the cell phone, thus concealing the signals and the location of the user. However, we do not find that such

- 38 -

concealment is a necessary predicate to the Fourth Amendment claim presented under the facts of this case. We have previously recognized that in addition to using cell phones to make telephone calls, "a significant portion of our population relies upon cell phones for email communications, text-messaging information, scheduling, and banking." Smallwood, 113 So. 3d at 733. Requiring a cell phone user to turn off the cell phone just to assure privacy from governmental intrusion that can reveal a detailed and intimate picture of the user's life places an unreasonable burden on the user to forego necessary use of his cell phone, a device now considered essential by much of the populace.

"The fiction that the vast majority of the American population consents to warrantless government access to the records of a significant share of their movements by 'choosing' to carry a cell phone must be rejected." In re Application of the U.S. for an Order Authorizing the Release of Historical Cell-Site Information, 809 F. Supp. 2d at 127. The court in that case recognized that "there are circumstances in which the legal interest being protected from government intrusion trumps any actual belief that it will remain private." Id. at 124. In applying this principle to historical cell site location information, the court stated:

> [T]he court concludes that established normative privacy considerations support the conclusion that the reasonable expectation of privacy is preserved here, despite the fact that cell-site-location records is disclosed to cell-phone service providers. Applying the

- 39 -

third-party-disclosure doctrine to cumulative cell-site-location records would permit governmental intrusion into information which is objectively recognized as highly private. See Maynard, 615 F.3d at 555. Following the decision in Maynard, this court concludes that cumulative cell-site-location records implicate sufficiently serious protected privacy concerns that an exception to the third-party-disclosure doctrine should apply to them, as it does to content, to prohibit undue governmental intrusion. Consequently, the court concludes that an exception to the third-party-disclosure doctrine applies here because cell-phone users have a reasonable expectation of privacy in cumulative cell-site-location records, despite the fact that those records are collected and stored by a third party.

Id. at 126 (emphasis added) (footnote omitted). Although that case dealt with cumulative historical cell site location records, we conclude that same principle applies here, where real time cell site location information used for tracking is at issue.

We cannot overlook the inexorable and significant fact that, because cell phones are indispensable to so many people and are normally carried on one's person, cell phone tracking can easily invade the right to privacy in one's home or other private areas, a matter that the government cannot always anticipate and one which, when it occurs, is clearly a Fourth Amendment violation. The Supreme Court noted in Riley that "modern cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of the human anatomy. A smart phone of the sort taken from Riley was unheard of ten years ago; a significant majority of American adults now own such phones." Riley, 134 S. Ct. at 2484. The Court related data that

- 40 -

shows "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower." Id. at 2490. "Because cellular telephone users tend to keep their phone on their person or very close by, placing a particular cellular telephone within a home is essentially the corollary of locating the user within the home." In re Application, etc., 849 F. Supp. 2d at 541. This real risk of "inadvertent" violation of Fourth Amendment rights is not a risk worth imposing on the citizenry when it is not an insurmountable task for the government to obtain a warrant based on probable cause when such tracking is truly justified.

Finally, and perhaps most importantly, we conclude that cell phones are "effects" as that term is used in the Fourth Amendment.[15] Cell phones, many of which are "smartphones," are ubiquitous and have become virtual extensions of many of the people using them for all manner of necessary and personal matters. As the Supreme Court explained in Riley, "[t]he term 'cell phone' is itself

---

15. "The Framers would have understood the term 'effects' to be limited to personal, rather than real, property." Oliver v. United States, 466 U.S. 170, 177 n.7 (1984). Cell phones are "effects." State v. Granville, 423 S.W. 3d 399, 405 (Tex. Crim. App. Feb. 26, 2014). A vehicle is undisputedly an "effect" as that term is used in the Fourth Amendment. Jones, 132 S. Ct. at 949. Letters and other sealed packages are in the general class of "effects." United States v. Jacobsen, 466 U.S. 109, 114 (1984). Personal luggage is an "effect." Bond v. United States, 529 U.S. 334, 336-37 (2000). See also United States v. Wurie, 728 F.3d 1, 13 (1st Cir. 2013) (holding that a warrantless search of the defendant's cell phone as incident to his arrest violates the Fourth Amendment), cert. granted, Riley, 134 S. Ct. 999 (2014).

misleading shorthand' many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." Riley, 134 S. Ct. at 2489. Although the beeper in the Knotts case can be described as an item of personal property in the general category of an "effect" that was in Knotts' possession, it only came into his possession when he obtained the container in which the beeper was previously placed. Knotts did not knowingly obtain, consciously carry, and purposely use the beeper for all manner of personal and necessary functions, as occurs with cell phones. As Justice Sotomayor noted in her concurrence in Jones, owners of cell phones or cars equipped with GPS capability do not contemplate that the devices will be used to enable covert surveillance of their movements. Jones, 132 S. Ct. at 956 n.*. She also distinguished the "bugged container" in Karo by pointing out that the container "lacked the close relationship with the target that a car shares with its owner" and that the car's movements "are its owner's movements." Jones, 132 S. Ct. at 956 n.* (Sotomayor, J., concurring). This same comparison applies with even more weight when considering the close relationship an owner shares with his cell phone, thereby making a cell phone's movements its owner's movements, often into clearly protected areas.

The United States Supreme Court's <u>Knotts</u> decision was decided on facts very different from this case. In the <u>Knotts</u> era, high tech tracking such as now occurs was not within the purview of public awareness or general availability. Thus, we conclude that we are not bound to apply the holding in <u>Knotts</u> to the current, and different, factual scenario. As noted earlier, the Court in <u>Jones</u> stated that "[i]t may be that achieving the same result [tracking on public streets] through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy, but the present case does not require us to answer that question." <u>Jones</u>, 132 S. Ct. at 954 (bracketed material added). This statement would have been unnecessary, and in fact nonsensical, if <u>Knotts</u> had already answered the question concerning use of electronic tracking without a trespass, as occurred in this case by officers obtaining cell site location information from Tracey's cell phone. Further, Justice Sotomayor, in her concurrence, also noted that <u>Knotts</u> does not foreclose the conclusion that GPS monitoring, in the absence of physical intrusion, is a Fourth Amendment search. <u>Jones</u>, 132 S. Ct. at 956 n.* (Sotomayor, J., concurring). This same conclusion can be reached as to real time cell site location monitoring.

We are mindful that for most of the time Tracey was being tracked by use of his cell phone signals he was on public roads where he could be observed, and that the Supreme Court reiterated in <u>Jones</u> that mere visual observation of an individual

on public roads is not a search.  <u>Jones</u>, 132 S. Ct. at 953.  However, in this case, law enforcement did not know of Tracey's whereabouts on the public roads and, thus, could not track him by visual observation.  Officers learned of his location on the public roads, and ultimately inside a residence, only by virtue of tracking his real time cell site location information emanating from his cell phone.  We are guided by the principle announced long ago that "the Fourth Amendment protects people, not places."  <u>Katz</u>, 389 U.S. at 351.  When that protection is violated, the Supreme Court wisely opined in <u>Katz</u> that "bypassing a neutral predetermination of the <u>scope</u> of a search leaves individuals secure from Fourth Amendment violations 'only in the discretion of the police.' "  389 U.S. at 358-59.  Currently, this sole discretion of police, if unchecked by the Fourth Amendment, would extend to the more than 300 million cell phone users in America.[16]

For all the foregoing reasons, we conclude that Tracey had a subjective expectation of privacy in the location signals transmitted solely to enable the private and personal use of his cell phone, even on public roads, and that he did not voluntarily convey that information to the service provider for any purpose other than to enable use of his cell phone for its intended purpose.  We arrive at this conclusion in part by engaging in the "normative inquiry" envisioned in <u>Smith</u>.

_____

16.  <u>See</u> <u>Jones</u>, 132 S. Ct. at 945 (Alito, J., concurring) (reporting that as of June 2011, there were more than 322 million wireless devices in use in the United States).

See Smith, 442 U.S. at 740 n.5. There, the Supreme Court cautioned that where an individual's subjective expectations have been "conditioned" by influences alien to the well-recognized Fourth Amendment freedoms, a normative inquiry may be necessary to align the individual's expectations with the protections guaranteed in the Fourth Amendment.

Moreover, we conclude that such a subjective expectation of privacy of location as signaled by one's cell phone—even on public roads—is an expectation of privacy that society is now prepared to recognize as objectively reasonable under the Katz "reasonable expectation of privacy" test. See Katz, 389 U.S. at 361 (Harlan, J., concurring) (establishing the two-pronged "reasonable expectation of privacy" test). Therefore, we hold that regardless of Tracey's location on public roads, the use of his cell site location information emanating from his cell phone in order to track him in real time was a search within the purview of the Fourth Amendment for which probable cause was required. Because probable cause did not support the search in this case, and no warrant based on probable cause authorized the use of Tracey's real time cell site location information to track him, the evidence obtained as a result of that search was subject to suppression.[17]

---

17. By our ruling here, we do not reach the issue of any recognized exceptions to the warrant requirement, such as exigent circumstances that require immediate location of a subject's cell phone, nor do we set forth here what might constitute exigent circumstances or other bases for exception to the warrant requirements of the Fourth Amendment.

We further hold that under the circumstances of this case in which there was no warrant, court order, or binding appellate precedent authorizing real time cell site location tracking upon which the officers could have reasonably relied, the "good faith" exception to the exclusionary rule for "objectively reasonable law enforcement activity" set forth by the Supreme Court in <u>Davis v. United States</u>, 131 S. Ct. 2419, 2429 (2011), is not applicable. Thus, Tracey's motion to suppress the evidence should have been granted.

## CONCLUSION

Accordingly, we quash the decision of the Fourth District Court of Appeal in <u>Tracey v. State</u>, 69 So. 3d 992 (Fla. 4th DCA 2011), and remand for further proceedings consistent with this opinion.

It is so ordered.

PARIENTE, LEWIS, QUINCE, and PERRY, JJ., concur.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.
POLSTON, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., dissenting.

Because I conclude that the cell site location information obtained by the police for Mr. Tracey's cell phone is subject to the third-party-disclosure doctrine under <u>Smith v. Maryland</u>, 442 U.S. 735 (1979), I would approve the Fourth District Court of Appeal's decision to reject Tracey's Fourth Amendment

argument and to uphold the denial of his motion to suppress.  Accordingly, I dissent.

In Smith, the Supreme Court concluded that the installation and use without a search warrant of a pen register—a device that makes a record of numbers dialed on a telephone—did not violate the Fourth Amendment.  Id. at 745-46.  The Court reached this conclusion based on its determination—under an analysis derived from Katz v. United States, 389 U.S. 347 (1967)—that Smith had neither a subjective expectation of privacy nor an objectively reasonable expectation of privacy regarding the numbers he dialed.  Smith, 442 U.S. at 742-43.

As to the subjective expectation of privacy, the Supreme Court observed that it doubted "that people in general entertain any actual expectation of privacy in the numbers they dial."  Id. at 742.  The Court reasoned that "[a]ll telephone users realize that they must 'convey' phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed" and that they also realize "that the phone company has facilities for making permanent records of the numbers they dial."  Id.  In short, the Supreme Court concluded that "it is too much to believe that telephone subscribers . . . harbor any general expectation that the numbers they dial will remain secret."  Id. at 743.  In connection with this point, the Court observed that "[t]he fact that [Smith] dialed

the number on his home phone rather than on some other phone could make no conceivable difference, nor could any subscriber rationally think that it would." Id.

As to the existence of an objectively reasonable expectation of privacy, the Supreme Court stated that "even if petitioner did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not 'one that society is prepared to recognize as "reasonable." ' " Id. The Court rested its conclusion on what is known as the third-party-disclosure doctrine. Id. at 743. The Court pointed out that it "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." Id. at 743-44. In particular, the Court discussed its decision in United States v. Miller, 425 U.S. 435 (1976), which held that bank depositors have no legitimate expectation of privacy regarding financial information provided to a bank. See Smith, 442 U.S. at 744. The Court observed that "[b]ecause the depositor 'assumed the risk' of disclosure" in providing information to the bank, "the [Miller] Court held that it would be unreasonable for him to expect his financial records to remain private." Id.

The Court, therefore, determined that the third-party-disclosure doctrine negated any legitimate expectation of privacy regarding the numbers dialed on a telephone:

> When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and "exposed" that information

to its equipment in the ordinary course of business. In so doing, petitioner assumed the risk that the company would reveal to police the numbers he dialed. The switching equipment that processed those numbers is merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber.

Id.

Application of the Katz analysis regarding expectations of privacy leads to a conclusion with respect to the cell site location information at issue here that is no different from the conclusion reached in Smith regarding the pen register data. As the United States Court of Appeals for the Fifth Circuit has explained:

> A cell service subscriber, like a telephone user, understands that his cell phone must send a signal to a nearby cell tower in order to wirelessly connect his call. Cell phone users recognize that, if their phone cannot pick up a signal (or "has no bars"), they are out of the range of their service provider's network of towers. . . . Cell phone users . . . understand that their service providers record their location information when they use their phones at least to the same extent that the landline users in Smith understood that the phone company recorded the numbers they dialed.
>     . . . .
>     . . . Because a cell phone user makes a choice to get a phone, to select a particular service provider, and to make a call, and because he knows that the call conveys cell site information, . . . he voluntarily conveys his cell site data each time he makes a call.

In re Application of the United States for Historical Cell Site Data, 724 F.3d 600, 613-14 (5th Cir. 2013) (internal citations omitted); see also United States v. Graham, 846 F. Supp. 2d 384, 400 (D. Md. 2012) ("Like the bank records at issue in Miller, [and] the telephone numbers dialed in Smith, . . . historical cell site location records are records created and kept by third parties that are voluntarily

conveyed to those third parties by their customers."); United States v. Madison, 2012 WL 3095357, at *9 (S.D. Fla. July 30, 2012) ("Just as the Smith petitioner's actions of making telephone calls provided information to the petitioner's telephone company, Defendant knowingly and voluntarily gave information to his communications-service provider that he was located within the range of specific cell towers at the times that he made and received calls on his cell phone.")

Given the known realities of how cell phones operate—realities understood and accepted by all but the most unaware—under the Katz analysis as applied in conjunction with the third-party-disclosure doctrine, cell phone users have neither a subjective expectation of privacy nor an objectively reasonable expectation of privacy regarding the cell site information generated by their cell phones.

Under Katz and its progeny there is—for good or for ill—an important distinction between a desire for privacy and a legitimate expectation of privacy. Individuals may very reasonably desire that information they provide to third parties—such as a cell service provider, a bank, or a credit card company—be kept private. But a strong desire for privacy is not equivalent to a legitimate expectation of privacy. And a strong desire for privacy does not provide a basis for this Court to abrogate the third-party-disclosure doctrine.

It is unquestionably true that cell site location information will ordinarily reveal significantly more information about the activities of a particular cell service

subscriber than pen register data reveals concerning the activities of a telephone subscriber. It is likewise unquestionably true that credit card records will often reveal significantly more information about the activities of a credit card user than bank records reveal concerning the activities of a bank depositor. But the extent of information made available is not a factor in the application of the third-party-disclosure doctrine as it has been articulated in the decisions of the Supreme Court.

It may well be that the vast expansion of data provided by individuals to third parties—along with a widespread heightened concern regarding the privacy of that data—points to a need for reexamining the third-party-disclosure doctrine. Any such reexamination, however, is properly within the province of the Supreme Court. The Supreme Court gave us the third-party-disclosure doctrine, and if that doctrine is to be judicially altered, it should only be altered by the Supreme Court. "[U]nless and until the Supreme Court affirmatively revisits the third-party [disclosure] doctrine, the law is that a 'person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.' " Graham, 846 F. Supp. 2d at 403.

Suppression of the cell site location information here is supported by the holdings in neither United States v. Karo, 468 U.S. 705 (1984), nor United States v. Jones, 132 S. Ct. 945 (2012). Both of these cases are readily distinguishable on the ground that they dealt with information provided by tracking devices placed by

the government as distinct from information generated by the operation of a cell phone that the possessor of the cell phone chose to use. See Jones, 132 S. Ct. at 948; Karo, 468 U.S. at 708. Jones may well raise questions about the future direction of the law in this area, but—as the majority's discussion of Jones shows—the various opinions in Jones do not reflect any view endorsed by a majority of the justices that would condemn the police conduct at issue here as contrary to the Fourth Amendment. Jones simply provides no guidance to support the conclusion that the third-party-disclosure doctrine is inapplicable here.

The Fourth District's decision to uphold the denial of Tracey's motion to suppress should be approved, and Tracey's conviction should not be disturbed.

POLSTON, J., concurs.

POLSTON, J., dissenting.

I agree with Justice Canady's dissent based on the third-party disclosure precedent by the United States Supreme Court. However, I believe there is justification for the United States Supreme Court to rule that individuals have a reasonable expectation that their real-time location will not be disclosed, without a search warrant, to law enforcement just by their cell phones being turned on. If that is not the case, we may be facing a situation "in which Katz' two-pronged inquiry [provides] an inadequate index of Fourth Amendment protection." Smith v. Maryland, 442 U.S. 735, 740 n.5 (1979).

Application for Review of the Decision of the District Court of Appeal – Constitutional Construction

Fourth District - Case No. 4D09-3565

(Broward County)

Carol Stafford Haughwout, Public Defender, and Tatjana Ostapoff, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida,

for Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Consiglia Terenzio, Bureau Chief, and Melynda Layne Melear, Assistant Attorney General, West Palm Beach, Florida,

for Respondent