Opinion by Associate .Judge Beckwith for the court, except as to Part II.E.3. Opinion by Senior Judge Farrell, concurring in part and concurring in the judgment, at page 725-26. Dissenting opinion by Associate Judge Thompson, at page 728-29. Beckwith, Associate Judge: A jury, found appellant Prince Jones guilty of various offenses arising out of two alleged incidents of sexual assault and robbery at knifepoint.[1] Mr, Jones appeals his convictions on the ground that much of the evidence offered against him at trial was the direct or indirect product of a warrant-less — and thus, Mr. Jones argues, unlawful-search involving a cell-site simulator or “stingray.”[2] Mr. Jones presented this Fourth Amendment claim to the trial court in a pretrial motion to suppress, but the trial court denied it under the inevitable-discovery doctrine[3] and did hot reach the question whether the government violated Mr. Jones’s rights. We agree with Mr. Jones that the government violated the Fourth Amendment when it deployed the cell-site simulator against him without first obtaining a warrant based on probable cause. Further, we reverse the trial court’s inevitable-discovery ruling and reject the government’s argument (not resolved by the trial court) that the good-faith doctrine [4] precludes applying the exclusionary rule in this case. Because the admission at trial of the evidence obtained as a result'of the unlawful search was-not harmless beyond a reasonable doubt, we reverse Mr. Jones’s convictions. I. Background A. Investigation and Arrest of Mr. Jones At the suppression hearing fa this case, Detective Rachel Pulliam, a member of the Sexual'Assault-Unit of the Metropolitan Police Department (MPD), testified that she investigated a sexual assault that occurred around 12:30 a.m. on October 9, 2013, and another that occurred around 1:30 a.m. on October 11.' The two sexual-assault complainants were women who had advertised escort services on the classified-advertising website Backpage, Detective Pulliam testified that on each occasion, the perpetrator[5] contacted the complainant by telephone in response to an advertisement and arranged to pay the complainant for sexual services. According to Detective Pulliam, when each complainant arrived at the arranged meeting place, the perpetrator “forced [her] to perform oral sex on [him] at knifepoint” and robbed her of her cellphone and other property. Detective Pulliam testified that on one of the two occasions, the perpetrator also robbed the complainant’s cousin, who had been waiting in a car outside the meeting location. Detective Pulliam testified that in the morning following the second incident, she and her colleagues obtained telephone records for the sexual-assault complainants. The telephone records revealed a possible suspect: Both complainants had received calls from the same number during the relevant time periods. Detective Pulliam sought the assistance of the MPD’s Technical Services Unit (TSU) to track the suspect’s and the complainants’ phones. Sergeant Todd Perkins, a supervisor in the TSU, testified about his office’s efforts to track the phones that morning. He testified that he and his team sought “subscriber information” for the suspect’s number from the provider associated with that number but were unsuccessful — the cellphone “was just a generic prepaid” with “no subscriber information whatsoever.” The TSU also sought and obtained information about the locations of the suspect’s and complainants’ cellphones from the relevant telecommunication providers.[6] According to Sergeant Perkins, the TSU received updated location information from the providers every fifteen minutes. The information came in the form of geographic coordinates — latitude and longitude— with a “degree of uncertainty” specified in meters. Sergeant Perkins testified that the real-time location information they received that morning had a high degree of uncertainty — “several hundred meterfs]” — indicating that the phones’ GPS capabilities were inactive. He explained that “if it [had been] true GPS,” his team would have been “getting two meter, three meter, five meter hits.” Despite the lack of precision in the location information, Sergeant Perkins and his team were able to “tell that ... one of the [complainants’] phones and the [suspect’s] phone were traveling in the same general direction ... as if they were together.” The location information suggested that the two phones stopped in the general vicinity of the Minnesota Avenue Metro Station. Based on this information, Sergeant Perkins and other TSU officers took a truck equipped with a cell-site simulator to the area of the Minnesota Avenue Metro station and used the device to track the suspect. Sergeant Perkins could not remember whether he and his team used the cell-site simulator to track the suspect’s phone or the complainant’s phone that they believed was traveling with it,[7] but whichever signal they were tracking led them, at around 11:30 a.m., to a parked Saturn. Inside the Saturn were Mr. Jones and Mr. Jones’s girlfriend, Nora Williams. The police arrested Mr. Jones and recovered evidence from Mr. Jones’s person and his car and from Ms. Williams, including a folding knife and the complainants’ and the suspect’s cellphones. Mr. Jones also made an incriminating statement to the police. Ms. Williams later testified against Mr. Jones at trial. B. Cell-Site Simulator Sergeant Perkins testified at the suppression hearing about “how [the cell-site simulator they used] works,” “based on the information that’s publicly available.” He explained that his team engages the cell-site simulator by programming into it a unique identifier — an MIN or IMSI number[8] — associated with the target phone.[9] The simulator then begins “listening for [the target] phone,” which, as part of its normal operation, is “constantly transmitting to and receiving from a tower.” The officers operating the cell-site simulator drive around and “as soon as [the simulator] comes across [the target phone’s signal], it grabs it and it holds on to it.” Once the cell-site simulator “grabs” the target phone, the simulator begins reporting “general location information and signal strength” that can be used to locate the target phone’s exact location.[10] Sergeant Perkins testified that once the cell-site simulator “grabs” the target phone, the target phone is prevented from communicating “with an actual ... tower.” Further information about the cell-site simulator was provided by Ben Levitan, an expert on “cellular telephone networks and systems” called by the defense.[11] According to Mr. Levitan, cell phones are “dumb devices” that “generally connect themselves to the strongest cell tower signal that they detect.” Mr. Levitan explained that a cell-site simulator “act[s] as a portable cell tower,” which, “when turned on or brought into an area, may appear to be a stronger signal and cause [a] phone[] to break its connection with the cell phone network and reattach itself to the newly found ... simulator.”[12] Mr. Levitan testi-fled that when the cellphone “attaches]” itself to the cell-site simulator, it “identifies itself by phone number and various codes,” including its IMSI number.[13] Although Mr. .Levitan had never used the type of cell-site simulator utilized by law enforcement, he testified that he had used similar devices working within the telecommunications industry and that the devices allow the user to determine the target phone’s direction and distance relative to the simulator device.[14] Moreover, because the cell-site simulator is not a true cell tower connected with the cellular network, any cellphone connected to the cell-site simulator will not be able to communicate with the network: “[Y]our call doesn’t go through!,], period. Nothing happens.”[15] C. Trial Court’s Ruling on the Motion To Suppress In ruling on Mr! Jones’s motion to suppress, the trial court did not decide whether the use of a cell-site simulator was a search within the meaning of the Fourth Amendment or whether the government was required to obtain a warrant to use the cell-site simulator. Instead, the trial court focused on the issues of standing, exigent circumstances, and inevitable discovery. On the issue of standing, the trial eourt stated that the suppression-hearing record did not reveal “with any great dégree of certainty” which phone — Mr. Jones’s or the complainant’s — the police had tracked using the cell-site simulator. The court believed that the burden was on the government to show that the police did not track Mr. Jones’s phone and found that the government had failed to meet this burden. The government did not' take issue with this allocation of the burden of proof and agreed with the court’s determination.[16] The trial court rejected the government’s argument that there were exigent circumstances justifying noncompliance with any otherwise applicable warrant requirement — though, again, the trial court did hot determine .whether there was a warrant requirement. The court noted that significant time (around ten hours) had passed between the sexual assault and the arrest of Mr. Jones on October 11, during which time “the detectives could have been getting a warrant.” The trial court agreed with the government’s argument that regardless of whether there had been a. Fourth Amendment violation, the inevitable-discovery doctrine rendered the exclusionary rule inapplicable. The court found that “even ,if [the police] were using [Mr. Jones’s] phone on the cell site simulator, .,, had they switched over ... to use the [complainant’s] number instead, . they would have eventually gotten to the exact same place because the phones were together [a]nd it’s the same technology.” The court thus agreed with the government’s assertion that “there [was] a separate lawful means” by which the government “would have gotten to the exact same place.” II. Discussion Mr. Jones claims that the government’s use of a- cell-site simulator violated his Fourth Amendment rights and that the trial court erred in failing to grant his motion to suppress. In deciding' this Fourth Amendment claim, we defer to the trial court’s factual findings and review them only for clear error, but we review the trial court’s legal conclusions de novo. (Albert) Jones v. United States, 154 A.3d 591, 594 (D.C. 2017). The Fourth Amendment protects the “right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,” and thus we turn first to the threshold question-whether the government’s use of the cell-site simulator to locate Mr. Jones’s cellphone[17] constituted a search or seizure. A. Fourth Amendment Search Government conduct is a “search” within the meaning of the Fourth Amendment if it invades “an actual (subjective) expectation of privacy ... that society is prepared to recognize as reasonable.” Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) (internal quotation marks omitted); see also Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001); Napper v. United States, 22 A.3d 758, 767 (D.C. 2011). In deciding whether a particular expectation of privacy is “reasonable,” this court aims to “assure[ ] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.” Kyllo, 533 U.S. at 34, 121 S.Ct. 2038. “To withdraw protection of this minimum expectation would be to permit police technology to erode the privacy guaranteed by the Fourth Amendment.” Id. Our analysis begins with the obvious fact that most people have a cellphone and carry it with them practically everywhere they go.[18] One consequence of this is that locating and tracking a cellphone using a cell-site simulator has the substantial potential to expose the owner’s intimate personal information. First, “cell phone tracking can easily invade the right ■ to privacy in one’s home or other private areas.” Tracey v. State, 152 So.3d 504, 524 (Fla. 2014); see also State v. Earls, 214 N.J. 564, 70 A.3d 630, 642 (2013) (“[C]ell phones ... blur the historical distinction between public and private areas because [they] emit signals from both places.”). When this occurs, there is a “dear[ ] ... Fourth Amendment violation.” Tracey, 152 So.3d at 524; see also United States v. Karo, 468 U.S. 705, 714, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (“[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable.”). And second, even a person’s public movements, as observed by a cell-site simulator or other means of cellphone tracking, can reveal sensitive information about the person’s “familial, political, professional, religious, and sexual associations.” United States v. (Antoine) Jones, 565 U.S. 400, 415, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) (Sotomayor, J., concurring). Another consequence of cellphones’ “pervasiveness”[19] is that a cell-site simulator can be. used by the government not merely to track a person but to locate him or her. See State v. Andrews, 227 Md.App. 350, 134 A.3d 324, 348 (2016). Police have always had the capacity to visually track a suspect from some starting location, and electronic tracking devices like those used in United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), and Karo, 468 U.S. 705, 104 S.Ct. 3296, have augmented this preexisting capacity. But although the kind of device used in Knotts and Karo is probably more reliable than a human tracker — less prone to discovery than a human and harder to elude — at their core these devices merely enable police officers to accomplish the same task that they could have accomplished through “[v]isual surveillance from public places.” Knotts, 460 U.S. at 282, 103 S.Ct. 1081; see also Karo, 468 U.S. at 713, 104 S.Ct. 3296. This is because the tracking device must bé physically installed on some object that the target will later acquire or use. See, e.g., (Antoine) Jones, 565 U.S. at 402-03, 132 S.Ct. 945 (GPS tracker placed on the defendant’s wife’s car); Karo, 468 U.S. at 708, 104 S.Ct. 3296 (tracker placed in container of chemicals the defendant had purchased); Knotts, 460 U.S. at 276, 103 S.Ct. 1081 (same). These devices do not enable police to locate a person whose whereabouts were previously completely unknown. With a cell-site simulator, however, police no longer need to track a person visually from some starting location or physically install a tracking device on an object that is in, or will come-into, his or her possession. Instead, they can remotely activate the latent tracking function of a device that the person is almost certainly carrying in his or her pocket or purse: a cellphone. As the present case demonstrates, police officers first obtain subscriber information and real-time location information from the target’s telecommunications provider to narrow down the search area.[20] They then proceed to that area with a cell-site simulator, which they use to force the person’s cellphone to identify itself and reveal its exact location. It is in this sense that a cell-site simulator is a locating, not merely a tracking, device: A cell-site simulator allows police officers who possess a person’s telephone number to discover that person’s precise location remotely and at will. A final consideration is that when the police use a cell-site simulator to locate a person’s cellphone, the simulator does not merely passively listen for transmissions sent by the phone in the ordinary course of the phone’s operation. Instead, the cell-site simulator exploits a security vulnerability in the phone — the fact that cellphones are, in the words of the defense expert, “dumb devices,” unable to differentiate between a legitimate cellular tower and a cell-site simulator masquerading as one[21] — and actively induces the phone to divulge its identifying information. Once the phone is identified, it can be located. So far as the present record reveals, the only countermeasure that a person can undertake is to turn off his or her cellphone or its radios (put it in “airplane mode”), thus forgoing its use as a communication device. The preceding considerations lead us to conclude that the use of a cell-site simulator to locate Mr. Jones’s phone invaded a reasonable expectation of privacy and was thus a search. First, given the potential for location information gathered by a cell-site simulator or other device to reveal sensitive personal facts, people justifiably seek to keep such information private. This is insufficient, in itself, to support our conclusion that the government invaded a legitimate expectation of privacy: Supreme Court precedent makes clear that certain forms of tracking do not invade a reasonable expectation of privacy. See Knotts, 460 U.S. at 282, 103 S.Ct. 1081 (holding that the use of an electronic device to track a suspect’s movements in public spaces did not invade a reasonable expectation of privacy);[22] see also Karo, 468 U.S. at 719, 104 S.Ct. 3296 (holding that the unlawful use of a device to track movements inside a residence did not necessarily taint the otherwise lawful use of the same device to track the suspects in public). But in addition to the fact that people reasonably value and hope to protect the .privacy of their location information, what necessitates our conclusion is the method, by which the government obtained the location information in this case. See Kyllo, 533 U.S. at 35 n.2, 121 S.Ct. 2038 (“The fact that equivalent information could sometimes be obtained by other means does not make lawful'the use'of means that violate the Fourth Amendment.”); United States v. Maynard, 615 F.3d 544, 566 (D.C. Cir. 2010) (“[W]hen it comes to the Fourth Amendment, means do matter.”), aff'd on other grounds by (Antoine) Jones, 565 U.S. 400, 132 S.Ct. 945. Unlike in a situation in. which the government determines a person’s location through visual surveillance or by employing the older generation, of tracking devices, see Karo, 468 U.S. at 719, 104 S.Ct. 3296; Knotts, 460 U.S. at 282, 103 S.Ct. 1081, it cannot be argued that “the information obtained by [the government] in this case was ... readily available and in the public view,” Andrews, 134 A.3d at 348. The cell-site simulator employed in this case gave the government a powerful person-locating ‘capability that private actors do not have and that, as explained above, the government itself had previously lacked — a .capability only superficially analogous .to the visual tracking of a suspect,[23] And the simulator’s operation involved exploitation of a security flaw in a device that most people now feel obligated to cairy with them' at all times. Allowing the government to deploy such a powerful tool without judicial oversight would surely “shrink the realm of guaranteed privacy” far below that which “existed when the Fourth Amendment was adopted.” Kyllo, 533 U.S. at 34, 121 S.Ct. 2038. It would also place an individual in the difficult position either of accepting the risk that at any moment his or her cellphone could be converted into tracking device or of forgoing “necessary use of’ the cellphone. Tracey, 152 So.3d at 523. We thus-conclude that under ordinary circumstances, the use of a cell-site simulator to locate a person through his or her cellphone invades the person’s actual,[24] legitimate, and reasonable expectation of privacy in his or her location information and is a search. The government’s argument to the contrary is unpersuasive. The government contends that because a cellphone “must continuously broadcast a signal,” a person who carries or uses a cellphone is.engaging in “conduct [that] is not calculated to keep [his] location private and ... thus[ ] has no reasonable expectation of privacy in his location.” The govenment cites for support United States v. Wheeler, 169 F.Supp.3d 896 (E.D. Wis. 2016), in which the court found that “today, when many Americans own some sort of cell phone and carry it frequently, an individual’s expectation that the government could not track his whereabouts over time is [not] reasonable.” Id. at 908; see also id. (“The media is rife with information — and sometimes warnings — about the fact that one’s location can be tracked from one’s cell phone.”).[25] This line of reasoning rests on a misreading of the Katz expectation-of-privacy test that construes the test as involvr ing a probabilistic inquiry (an inquiry into whether it is likely — or the public thinks it is likely — that the government can aceess the information in question) rather than a normative one (an inquiry into whether it is consistent with the nation’s traditions and values that the government should have unfettered access to the information).[26] Contrary to the government’s argument, Katz makes clear that a person does not lose a reasonable expectation of privacy merely because he or she is made aware of the government’s capacity to invade his or her privacy. When Katz was issued, the public and the courts were well aware of the government’s capacity to wiretap and eavesdrop through technological means, yet the Supreme Court did not find this fact determinative of the question whether individuals possess a reasonable expectation of privacy in their conversations. See Katz, 389 U.S. at 352, 88 S.Ct. 507 (citing Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (wiretapping), and Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942) (bugging)); see also Susan Freiwald, First Principles of Communications Privacy, 2007 Stan. Tech. L. Rev. 3, 28 (“In the several years preceding Katz, the public had learned of rampant illegal wiretapping from numerous influential books, scholarly articles, and newspaper accounts.”). A person’s awareness that the government can locate and track him or her using his or her cellphone likewise should not be sufficient to negate the person’s otherwise legitimate expectation of privacy. See also Smith v. Maryland, 442 U.S. 735, 741 n.5, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (“[WJhere an individual’s subjective expectations ha[ve] been ‘conditioned’ by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection [is].”); 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1 (d) (5th ed. 2016) (“[W]hat is involved here is ‘our societal understanding’ regarding what deserves ‘protection from government invasion.’” (quoting Oliver v. United States, 466 U.S. 170, 178, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984))). The government’s use of the cell-site simulator to locate Mr. Jones was therefore a search.[27] The government did not obtain a warrant and has not argued that the search “f[ell] within a specific exception to the warrant requirement,” and therefore the search was unlawful under the Fourth Amendment. Riley v. California, — U.S. -, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014); see also United States v. Lewis, 147 A.3d 236, 239 (D.C. 2016) (en banc) (“A search conducted without a warrant is per se unreasonable under the Fourth Amendment unless it falls within a few specific and well-established exceptions.” (quoting United States v. Taylor, 49 A.3d 818, 821 (D.C. 2012))).[28] Our conclusion that the government violated Mr. Jones’s Fourth Amendment rights is not the end of our inquiry. We must decide whether Mr. Jones is entitled to a remedy, and if so what the scope of that remedy should be. As a general matter, the- “[exclusionary rule ... forbids the use of improperly obtained evidence at trial.” Herring v. United States, 555 U.S. 135, 139, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). “[T]his judicially created rule is ‘designed to safeguard Fourth Amendment rights generally through its deterrent effect.’ ” Id. at 139-40, 129 S.Ct. 695 (quoting United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). The government argues that the exclusionary rule does not apply in this case, invoking the inevitable-discovery doctrine, good-faith exception, and a change in its policies concerning the use of cell-site simulators. The government also argues that much of the evidence that Mr. Jones wants excluded does not fall within the scope of the exclusionary rule— that it is not “fruit of the poisonous tree.” Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We first address the inevitable-discovery doctrine. B. Inevitable-Discovery Doctrine The inevitable-discovery doctrine “shields illegally obtained evidence from the exclusionary rule if the government can show, by a preponderance of the evidence, that the evidence ‘ultimately or inevitably would have been discovered by lawful means.’ ” Gore v. United States, 145 A.3d 540, 548 (D.C. 2016) (quoting Hicks v. United States, 730 A.2d 657, 659 (D.C. 1999)); see also Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). To avail itself of the inevitable-discovery doctrine, the government must prove two distinct elements: (1) that “the lawful process which would have ended in the inevitable discovery ... ha[d] commenced before the constitutionally invalid seizure,” and (2) that there is a “ ‘requisite actuality’ that the discovery would have ultimately been made by lawful means.” Hicks, 730 A.2d at 659 (quoting Douglas-Bey v. United States, 490 A.2d 1137, 1139 n.6 (D.C. 1985), and Hilliard v. United States, 638 A.2d 698, 707 (D.C. 1994)) (brackets and ellipsis removed). The trial court found that “had [the police] switched [the cell-site simulator] over to use’ the [complainant’s phone] ... they would have eventually gotten to the exact same place because the phones were together.” Assuming for the sake of argument that the hearing evidence supports this finding,[29] we agree with the trial court that this finding justifies a conclusion that there was a separate lawful means by which the police could have captured Mr. Jones and recovered the' evidence used against him at trial.[30] The finding is insufficient, however, to support a conclusion that the police would have'captured Mr. Jones — which is what the inevitable-discovery doctrine requires. The undisputed evidence in the record shows that the MPD possessed only a single operating cell-site simulator,[31] and that it could only be used to locate a single phone at a time. The police used it to search for Mr. Jones’s cellphoné. Thus, the police’s search for the complainant’s cellphone — the lawful process — never occurred. If the lawful search never occurred, it did not “commencef ] before the constitutionally invalid seizure” of Mr. Jones. Hicks, 730 A.2d at 659 (quoting Douglas-Bey, 490 A.2d at 1139 n.6). The government disagrees with this conclusion and argues that because the police had tracked the complainant’s phone using real-time location information from the provider and had obtained her phone’s identifying information, they “had begun the process necessary to locate her phone with the cell-[s]ite simulator.” Even if we agreed that these steps constituted the commencement of a lawful process, we would nonetheless find the second element of the inevitable-discovery test — the “requisite actuality” that the process would have led to the discovery of Mr. Jones— lacking. This is because the police either suspended or abandoned the purported lawful process when they chose to deploy the only operational cell-site simulator in their possession on Mr. Jones’s phone. This court has found the inevitable-discovery doctrine applicable in eases in which the police engaged in lawful and unlawful processes in parallel. See Pinkney v. United States, 851 A.2d 479, 495 (D.C. 2004); McFerguson v. United States, 770 A.2d 66, 74-75 (D.C. 2001); Hicks, 730 A.2d at 662. Had the unlawful process not occurred in these cases, the lawful one would inevitably have produced the same evidentiary result; But here the government is asking us to find inevitable discovery where the police had mutually exclusive- options and, for whatever reason, chose the option that turned out to be unlawful. The inevitable-discovery doctrine does not apply in this type of situation. See Gore, 145 A.3d at 549 n.32 (“[T]he argument that ‘if we hadn’t done it wrong, we would have done it right’ is far from compelling.” (quoting 6 LaFave, supra, § 11.4 (a)) (internal quotation marks omitted)).[32] C. Good-Faith Exception We turn next to the government’s argument that application of the exclusionary rule here “would not meaningfully deter police misconduct” because the use of the cell-site simulator to locate Mr. Jones was “not the type of ‘flagrant’ abuse for which the exclusionary rule was designed.” In support of this argument, the government notes that Sergeant Perkins and his team believed “exigent circumstances existed” and asserts that “at the time of this incident, no court had held that-using a simulator to locate a phone violates the Fourth Amendment.” The government further points out that the police received judicial approval for various secondary searches of the evidence recovered from Mr. Jones and Ms. Williams at the time of Mr. Jones’s arrest. Specifically, the police obtained warrants to search Mr. Jones’s Saturn and the phones they recovered from Mr.’ Jones -and Ms. Williams, and secured a court order to take’’a buccal swab from Mr. Jones, Although it does not explicitly say so, the government is invoking the “good-faith exception ” Davis v. United States, 564 U.S. 229, 239, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011). The Supreme Court first recognized this exception in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), holding that “evidence obtained [by the police] in objectively reasonable reliance on a subsequently invalidated search warrant” is not subject to the exclusionary rule. Id. at 922, 104 S.Ct. 3405. This holding was based on the premise that “the deterrence rationale [for exclusion] loses much of its force” “when the police act with an objectively reasonable good-faith belief that their conduct is lawful,” Davis, 564 U.S. at 252, 131 S.Ct. 2419; id. at 238, 131 S.Ct. 2419 (quoting Leon, 468 U.S. at 909, 919, 104 S.Ct. 3405) (internal quotation marks omitted). The Court has since extended the good-faith exception to apply in various other situations involving nonculpable or merely negligent law-enforcement conduct. See, e.g., id. at 239-40, 131 S.Ct. 2419 (holding that the good-faith exception applies “when the police conduct a search in objectively reasonable reliance on binding judicial precedent”); Herring, 555 U.S. at 136, 129 S.Ct. 695 (holding that the good-faith exception applied to evidence obtained in a search incident to arrest where the officer “reasonably believe[d] there [wajs an outstanding arrest warrant” for the defendant, but where “that belief turn[ed] out to be wrong because of a negligent bookkeeping error by another police employee”).' The Supreme Court has not, however, recognized the applicability of the good-faith exception in a situation remotely like the present one — where the police, not acting pursuant to a seemingly valid warrant, statute, or court opinion, conducted an unlawful search using a secret technology that they had shielded from judicial oversight and public scrutiny. See supra note 26. Indeed, assuming the police believed the warrantless use of the cell-site simulator to-be lawful, they could not have reasonably relied on that belief, given the secrecy surrounding the device and the lack of law on the issue.[33] And the government does not argue that the police officers’ mistaken belief that exigent circumstances existed was reasonable or cite any case law that would support such an argument. The fact that some of the evidence was obtained in secondary searches pursuant to warrants and a court order does not change things. The police’s reliance on the warrants and order was not objectively reasonable because the warrants and order were based on information obtained in violation of Mr. Jones’s Fourth Amendment rights. See Evans v. United States, 122 A.3d 876, 886 (D.C. 2015) (“The subsequent issuance of [a] search warrant ..., based on information [illegally] obtained ..., d[oes] not operate to attenuate the [original] illegality.”).[34] Thus, the evidence the police obtained through their warrant-less use of the cell-site simulator is not subject to the good-faith exception. D. Change in Department of Justice Policy The government’s final argument for not applying the exclusionary rule is that a change in Department of Justice (DOJ) policy has diminished the likelihood that excluding the evidence in this case will deter misconduct in the future. The government asserts that the MPD is bound by a new DOJ policy to “obtain a search warrant supported by probable cause” before deploying a cell-site simulator. Dep’t of Justice Policy Guidance: Use of Cell-Site Simulator Technology at 3-4 (Sept. 3, 2015), https://www.justice.gov/ opa/file/767321/download. The government did not develop this argument in the trial court — and could not have, as the DOJ policy had not yet been issued — and we do not find it persuasive. The government has not cited any case in which a court has declined to apply the exclusionary rule based on the government’s representation that it will not engage in unlawful conduct in the future. The government cites Blair v. United States, 114 A.3d 960 (D.C. 2015), but in that case we relied on a change in a statute that eliminated the need to deter subsequent violations, not a mere change in policy. Id. at 973-74. And given that the DOJ policy memorandum does not describe any sort of enforcement mechanism that would ensure compliance with the policy, and given that the present administration or a subsequent one may well revise this policy, we are not convinced that the need to deter future constitutional violations is lacking. E. Fruit of the Poisonous Tree Having decided that the exclusionary rule applies in this case, we must now decide which evidence should be excluded as “fruit of the poisonous tree” of the illegal search.[35] Wong Sun, 371 U.S. at 488, 83 S.Ct. 407. In deciding whether evidence constitutes fruit of the poisonous tree, the critical inquiry is whether “the evidence ... has been come at by exploitation of th[e] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” Wong Sun, 371 U.S. at 488, 83 S.Ct. 407 (quoting John Maguire, Evidence of Guilt 221 (1959)); see also Wilson v. United States, 102 A.3d 751, 753 (D.C. 2014). The court considers “[t]he temporal proximity of the [illegality] and the [acquisition of the evidence], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.” Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (citations and footnote omitted); see also Gordon v. United States, 120 A.3d 73, 85 (D.C. 2015). Mr. Jones argues that the following evidence and testimony should have been excluded as fruits of the poisonous tree: his knife, a statement he made to the police at the scene of his arrest, cellphones recovered from Ms. Williams’s purse at the scene of the arrest, evidence (including cellphones) recovered from his car (the Saturn) pursuant to a warrant, data extracted from the various cellphones pursuant to warrants, the testimony of Ms. Williams, the later photo-array'identification of Mr. Jones by one of the complainants, a DNA profile generated from a buccal swab of Mr. Jones (a month after his arrest), and a photograph of Mr.' Jones’s groin.[36] The government “agrees that some", but not all, of the ... evidence [identified by Mr. Jones] is a fruit of the alleged poisonous tree.” The government only specifically objects to classifying (1) Mr. -Jones’s statement to the police, (2) the cellphones recovered from Ms. Williams’s purse, and (3) Ms. Williams’s testimony ais fruits' of the poisonous tree. 1. Prince Jones’s Statement ‘ Mr. Jones made an incriminating statement to the police qt the scene of the arrest: When asked what his address was, Mr. Jones gave the address of one of the sexual-assault complainants. The government argues that this statement should not be suppressed as a fruit of the unlawful eell-site-simulator .search because “[i]t would make little- sense to suppress evidence obtained merely as part of a routine booking procedure.” See Thomas v. United States, 731 A.2d 415, 421 (D.C. 1999) (recognizing “a routine booking question exception” to the "rule of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). We reject this argument. That the question about Mr. Jones’s address was otherwise proper does not negate the fact that very little time and no substantial intervening circumstances separated the illegal search from Mr. Jones’s incriminating response. See United States v. Olivares-Rangel, 458 F.3d 1104, 1112 (10th Cir. 2006), Mr. Jones’s' statement was a direct product of the unlawful search and is thus excludable as fruit of the poisonous tree. 2. Cellphones from Nora Williams’s Purse When the police located Mr. Jones and Ms. Williams, they searched Ms. Williams’s, purse and found several cellphones, including two of the complainants’ phones and Mr, Jones’s, phone, The government argues that the contents of Ms. Williams’s purse are not fruits of the poisonous tree because Mr. Jones did “not have a reasonable expectation of privacy in the contents of MÍs. Williams’s purse” and because “Ms. Williams gave the officers consent to search her purse.” Preliminarily, Mr. Jones’s expectation of privacy (or lack thereof) in Ms. Williams’s purse is not a material consideration in the fruit-of-the-poisonous-tree analysis. As one court has explained, “[wjhjle the fruit of the poisonous tree doctrine applies only when the defendant has . standing regarding the Fourth Amendment violation which constitutes the poisonous tree, the law imposes no separate standing requirement regarding the evidence which constitutes the fruit of that poisonous tree.”[37] Olivares-Rangel, 458 F.3d at 1117 (citation omitted); see also 6 LaFave, supra, § 11.4 (“If the defendant [has] standing with respect to the poisonous tree, that alone suffices ... The factors in Brown, 422 U.S. at 604, 95 S.Ct. 2264, moreover, compel a conclusion that the contents of Ms. Williams’s purse are fruits of the poisonous tree. First, as the search of Ms. Williams’s purse occurred at the scene of Mr. Jones’s apprehension and arrest, very little time passed between the police’s unlawful cell-site-simulator search and their recovery of the evidence from Ms. Williams’s purse. Second, Ms. Williams’s supposed consent was not a significant intervening circumstance. According to Detective Pulliam, Ms. Williams consented only after the police presented her with the following options: the police “would either have to take the purse and put it into police custody until [they] could get a search warrant and then search it or ... she could give [the police] consent to search it.” Given this threat and the fact thát her boyfriend, Mr. Jones,' had just been arrested in her presence, Ms. Williams’s consent was not sufficiently “the product" of free will [to] break ... the causal connection between the illegality and the” search of the purse. Brown, 422 U.S. at 603, 95 S.Ct. 2254; cf. Utah v. Strieff, — U.S. -, 136 S.Ct. 2056, 2062, 195 L.Ed.2d 400 (2016) (holding that a valid arrest warrant “entirely unconnected with -the [illegal] stop” was a sufficient intervening circumstance); 4 La-Fave, supra, § 8.2 (c) (explaining that a person’s consent to a search may be involuntary where the police, “‘trading on’ a prior Fourth Amendment violation,” have “threatened] to seek a warrant”).[38] And third, although the police officers’ warrantless use of the cell-site simulator here was not flagrant misconduct,[39], recovery of Mr. Jones’s cellphone and the complainants’ phones was undoubtedly one of the officers’ purposes in deploying the cell-site simulator. The cell-site simulator is used to locate.and track phones after all. The contents of Ms. Williams’s purse thus “bear a ... close relationship to the underlying illegality.” Gordon, 120 A.3d at 85 (quoting New York v. Harris, 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990)).[40] 3; Nora Williams’s Testimony[41] Mr. Jones argues that Ms. Williams should have been barred from testifying for the government at trial. The government disagrees, arguing that “[t]here was sufficient attenuation between the search and Ms. Williams’s testimony to dissipate any taint” and that “the government would have inevitably discovered Ms. Williams through independent sources.” In United States v. Ceccolini, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), the Supreme Court recognized factors pertinent to the determination of whether a witness’s testimony should be barred as fruit of the poisonous tree: (1) whether “the testimony given by the witness was an act of her own free will in no way coerced,” (2) whether evidence gathered or information learned as a result of the illegal search was used to question the witness, (3) whether “[s]ubstantial periods of time elapsed between the time of the illegal search and the initial contact with the witness ... and between the [initial contact] and the testimony at trial,” (4) whether the witness and “her relationship with the [defendant] were well known” to the police before the illegal search, and (5) whether the officers conducting the illegal search did so with the “intent of finding a willing and knowledgeable witness to testify against” the defendant. Id. at 279-80, 98 S.Ct. 1054; see also 6 LaFave, supra, § 11.4 (i). These factors weigh in favor of excluding Ms. Williams’s testimony. First, it is undisputed that Ms. Williams was not a willing witness for the government. As the government points out, Ms. Williams was initially “not forthcoming about her knowledge and use of the ... items” stolen from the complainants, and only testified after “the government sought and received a court order granting her immunity.” Ms. Williams testified at trial that after she was granted immunity, she testified for the grand jury “[b]ecause [she] had no choice.” She expressed unhappiness about having to testify against Mr. Jones at trial, stating that she “didn’t want to go against him.” Second, the government admits that the police “confronted [Ms. Williams] with the fact that stolen phones and other items were recovered from her purse and from the car.” This evidence, as explained above, was the product of the illegal search. The government’s attempt to minimize the significance of this fact is unpersuasive. The government contends that the “illegally obtained evidence ultimately did not play a great role in obtaining Ms. Williams’s testimony” and that it was the grant of immunity that was the decisive factor. But this argument fails to address the fact that the police questioned Ms. Williams before she was immunized, and is also speculative: It is plausible — indeed, likely — that both the grant of immunity and fact that Ms. Williams was found red-handed with the proceeds of the robberies played significant roles in her decision to testify. Third, a very short period of time passed between the illegal search and Ms. Williams’s first contact with the police. Indeed, Ms. Williams was present at Mr. Jones’s arrest and was questioned at the scene. See United States v. Ramirez-Sandoval, 872 F.2d 1392, 1397 (9th Cir. 1989). Approximately a year passed between the police’s initial contact with Ms. Williams and her testimony at trial, but a lengthy period between first contact and trial is almost always present in a criminal case, and this time period is less significant than the time period between the search and first contact. Moreover, the witness’s initial statements to the police will often significantly constrain the witness’s testimony at trial because the initial statements can be used to impeach the witness or bolster his or her testimony. See 1 Kenneth S. Broun et al., McCormick on Evidence § 34 (7th ed. 2016) (discussing the procedure of impeaching a witness with a prior inconsistent statement); id. § 47 (discussing the procedure of supporting a witness with a prior consistent statement). Fourth, although at trial the government offered in evidence surveillance footage of Ms. Williams using an ATM card stolen from one of the complainants, at the suppression hearing the government neither presented evidence nor argued that the police had this video before they conducted the illegal cell-site-simulator search or that the video would have enabled the police to locate Ms. Williams. Thus, based on the record before the court, it is not possible to conclude that the police were aware of Ms. Williams or her relationship with Mr. Jones before they located her through the illegal search. See also supra note 35. The remaining factor favors the government. Specifically, there is no reason to believe that the police intended their use of the cell-site simulator to result in the discovery of a witness for the government. Rather, the record before the court suggests that the police were trying to locate Mr. Jones — and, as a necessary consequence of their use of cellphone tracking, Mr. Jones’s cellphone. Nonetheless, because the other four factors strongly weigh in favor of suppression, there is “a close[ ], ... direct link between the illegality and [Ms. Williams’s] testimony.” Ceccolini, 435 U.S. at 278, 98 S.Ct. 1054. F. Harmless-Error Analysis The introduction of evidence collected in violation of Mr. Jones’s Fourth Amendment right to be free from unreasonable searches and seizures is constitutional error. So we must reverse Mr. Jones’s convictions unless the government has “prove[d] beyond a reasonable doubt that the error ... did not contribute to the verdict.” Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Because we have concluded that the fruits identified by Mr. Jones should have been excluded at his trial,[42] and because these fruits comprised some of the most damning evidence against him, we need not undertake a detailed analysis to conclude that the erroneous admission of these fruits at trial was not harmless beyond a reasonable doubt. The government does not argue otherwise. III. Conclusion For the foregoing reasons, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion. . Mr. Jones was convicted of two counts of first-degree sexual abuse while armed, D.C. Code §§ 22-3002 (a)(l)-(2), -3020 (a)(5), - 3020 (a)(6), -4502 (2012 Repl,); two counts of kidnapping while armed, id. §§ 22-2001, - 4502; four counts of robbery while armed, id. §§ 22-2801, -4502; and one count of threats, id. § 22-1810. . The "StingRay” is a popular cell-site simulator produced by the Harris Coiporation. See Stephanie K. Pell & Christopher Soghoi-an, Ypur Secret Stingray’s No Secret Anymore: The Vanishing Government Monopoly over Cell Phone Surveillance and Its Impact on National Security and Consumer Privacy, 28 Harv. J.L. & Tech. 1, 14 (2014). The name has become ,a generic term for a cell-site simulator. Kim Zetter, Hacker Lexicon: Stingrays, the Spy Tool the Government Tried, and Failed, to Hide, Wired (May 6, 2016), https://www. wired.com/2016/05/hacker-lexicon-stingrays-spy-tool-governmenttried-failed-hide/. The record in this case does not reveal the name of the device used against Mr. Jones; in the suppression hearing, the trial court sustained the government’s objection to a question about the name of the device. . See Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). . See United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). . Detective Pulliam referred to the perpetrator as “the defendant,” but Mr. Jones was not known to the police at the time the complainants reported the crimes and only became known after the police tracked him down using the cell-site simulator. . Officer Perkins testified that the TSU "declared an exigent situation” and was therefore "able to obtain the [real-time location] information without getting a warrant.” Officer Perkins admitted at the suppression hearing that his team had been operating under an erroneous belief that there had been a string of three sexual assaults by the same perpetrator within the preceding twenty-four ' hours. . As explained in the testimony summarized below, a cell-site simulator interferes with the target phone’s ability to communicate with the cellular network. Records for the complainant’s phone show that there was a single communication error around the time the TSU officers were operating the cell-site simulator, and Sergeant Perkins inferred from this — and from other circumstantial information — that his team had probably been tracking the complainant’s phone. Other evidence, however, suggested that the TSU may have been tracking the suspect's phone. In particular, records for the suspect’s phone — which turned out to be Mr. Jones's phone — show seven failed calls during the relevant time period, and a data dump of the phone revealed that during that time period Mr. Jones sent a text message which said, "Our call dropped.” . These identifying numbers are distinct from the seven- or ten-digit number that a person dials when he or she places a call. Sergeant Perkins testified that the TSU receives these numbers by requesting “subscriber information” for a phone number. He explained that "MIN” stands for “mobile identification number” and is the identifying number used by “Verizon, Cricket and Sprint” and that “IMSI” stands for "international mobile subscriber identification” and is used by "T-Mobile and AT & T.” . Sergeant Perkins testified that it is also possible to enter multiple identifying numbers into the cell-site simulator. In this operating mode, he explained, "the equipment will just let us know one of those phones is present in the area” but will not provide location information. . Sergeant Perkins explained the search process thus: [T]here is a directional antenna, ... so we’re driving this way, the directional antenna knows the signal is coming from over here, so we know the phone's coming over there. And then it also measures the signal strength from the phone, so if the signal strength is real, real low, it’s probably somewhere behind you, . The defense also submitted an affidavit by Mr. Levitan, which Mr. Levitan “adopt[ed] ... as part of [his] testimony,” without objection by the government. . Mr. Levitan testified that a cell-site simulator causes not only the target phone, but "[a]ll cell phones that are in the vicinity,” to "attach ... to the newly found ... simulator.” . Cell-site simulators are sometimes referred to as "IMSI catchers.” Pell & Soghoian, supra note 2, at 11. . Mr. Levitan testified that when a cellphone is communicating with a legitimate cellular tower, it communicates with a particular sector antenna of the tower, and that the provider can thus determine "what side of the cell tower” the cellphone is on, Mr, Levitan indicated that cell-site simulators measure direction through a similar method. But see supra note 10 (Sergeant Perkins describing a somewhat different method of determining direction), And Mr. Levitan testified that a cell-site simulator can determine distance through a "trick” in which it "send[s] ... a signal [to the phone] and ask[s] it to send ... the signal back.” By "measuring] th[e] round trip time,” the distance between the cell-site simulator and the phone can be determined. . We note that both witnesses’ testimony about the cell-site simulator is consistent with information in a Department of Justice memorandum on such devices. See Dep't of Justice Policy Guidance: Use of Cell-Site Simulator Technology (Sept. 3, 2015), https://www. justice.gov/opa/file/767321/download. The memorandum explains: Cell-site simulators ... function by transmitting as a cell tower. In response to the signals emitted by the simulator, cellular devices in the proximity of the device identify the simulator as the most attractive cell tower in the area and thus transmit signals to the simulator that identify the device in the same way that they would with a networked tower. Id. at 2. Once, the target cellphone is identified, the cell-site simulator "provide[s] ... the relative signal strength and general direction” of the phone. Id. The memorandum notes that the cell-site simulator can cause "cellular devices in the area [to] experience a temporary disruption of service from the service provider.” Id. at 5. .The government has reversed course in this appeal and is now arguing that Mr, Jones bore the burden of proving that the,government searched his phone and failed to meet this burden. But because the government affirmatively — and repeatedly — conceded the standing issue in the trial court, the government has waived this argument. . We consider it conceded that the government deployed the cell-site simulator on Mr. Jones's phone rather than on one of the complainants’ phones. See supra notes 7 & 16, as well as the accompanying text.. . See Riley v. California, — U.S. -, 134 S.Ct. 2473, 2490, 189 L.Ed.2d 430 (2014) ("[I]t is the person who is not carrying a cell phone ... who is the exception.,According to one poll, nearly three-quarters of smart phone users report being within five feet of their phones most of the time .... ”). . Riley, supra note 18, 134 S.Ct. at 2490. . Mr. Jones has not argued in this appeal that the government violated his Fourth Amendment rights when it obtained real-time cell-site location information (CSLI) for his phone from his telecommunications provider. Also not involved in this case is historical CSLI — location information maintained by cellular companies in the ordinary course of business. Some courts have held that the Fourth Amendment protects real-time CSLI, e.g., Tracey, 152 So.3d at 523, but many have held that the Fourth Amendment does not protect historical CSLI, e.g., United States v. Graham, 824 F.3d 421, 427-28 (4th Cir. 2016) (en banc). See generally Eric Lode, Annotation, Validity of Use of Cellular Telephone or Tower to Track Prospective, Real Time, or Historical Position of Possessor of Phone Under Fourth Amendment, 92 A.L.R. Fed. 2d 1 (2015), The Fourth Amendment analysis for real-time and historical CSLI disclosed by a telecommunications provider is complicated by uncertainty about the applicability and scope of the third-party doctrine. Compare Graham, 824 F.3d at 427-28 ("Each time Defendants made or received a call, or sent or received a text message — activities well within the 'ordinary course’ of cell phone ownership — [their provider] generated a record of the cell towers used .... Having 'exposed' the CSLI to [their provider], Defendants here, like the defendant in Smith, 'assumed the risk’ that the phone company would disclose their [historical CSLI] to the government.” (quoting Smith v. Maryland, 442 U.S. 735, 744, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979))), with In re United States for an Order Authorizing the Release of Historical Cell-Site Info., 809 F. Supp. 2d 113, 126 (E.D.N.Y. 2011) ("[T]he court concludes that established normative privacy considerations support the conclusion that the reasonable expectation of privacy is preserved here, despite the fact that cell-site-location records [are] disclosed to cell-phone service providers.”). The third-party doctrine has no application in the present case, however, because the police’s use of a cell-site simulator is "direct government surveillance.” Graham, 824 F.3d at 426 & n.4. . See also Pell & Soghoian, supra note 2, at 12 (explaining that active surveillance devices exploit the lack of an authentication mechanism in the 2G phone protocol design). , . But see (Antoine) Jones, 565 U.S. at 416, 132 S.Ct. 945 (Sotomayor, J., concurring) ("I do not regard as dispositive the fact that the Government might obtain the fruits of GPS monitoring through lawful conventional surveillance techniques.”); id. at 430, 132 S.Ct. 945 (Alito, J., concurring in judgment) ("[T]he use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.”). . We are accordingly unpersuaded by one court's suggestion that using cellular technology to track a suspect is .analogous to using "dogs ... to track a fugitive ... [by] his scent.” United States v. Skinner, 690 F.3d 772, 777 (6th Cir. 2012), And our dissenting colleague’s suggestion that the search here was permitted under the automobile exception to the Fourth Amendment, see post at 742-43, is similarly unconvincing. The dissent argues that under the automobile exception, police officers could have searched Mr. Jones’s car without a warrant and seized "any cell phones in it that might have been contraband or evidence of the crime.” Post at 743. From this, the dissent claims, it follows that the police had the right to use the cell-site simulator to search or seize Mr. Jones's phone. This argument glosses over the fact that what the cell-site simulator obtained was Mr. Jones's location information. When police search a car under the automobile exception, by contrast, they do not obtain location information — they already know the car’s location if they are searching it. The dissent also glosses over the fact that the police need probable cause to search a car under the automobile exception. Tuckson v. United States, 77 A.3d 357, 366 (D.C. 2013). The police here did not have probable cause to believe that there was evidence of a crime inside Mr. Jones’s ear Until they used the cell-site simulator to locate Mr, Jones’s cellphone. . Ordinarily, a person need not do anything affirmative to exhibit an actual subjective expectation that he or she will not be located and tracked by a cell-site simulator. In Katz, the defendant.was "entitled to assume” that his phone conversation was private based purely on the fact that he had “occupie[d] [the phone booth], shut[] the door behind him, and pa[id] the toll.” 389 U.S. at 352, 88 S.Ct. 507. Likewise, in Kyllo, the Supreme Court found that the use of a thermal imager on the defendant’s' home violated an expectation of privacy, without any discussion about whether the defendant had taken measures to. thwart the effectiveness of the device. 533 U.S. at 40, 121 S.Ct. 2038. But in fact in the present case, there was some evidence that Mr. Jones affirmatively sought to keep his location information private: His phone’s GPS feature (to the extent it existed) had been disabled. . The government also cites United States v. Caraballo, 831 F.3d 95 (2d Cir. 2016), cert. denied, — U.S. -, 137 S.Ct. 654, 196 L.Ed.2d 546 (2017), a case in which the police obtained real-time cell-site location information without a warrant. See supra note 20. The court approved the officers’ actions under the exigency exception. Caraballo, 831 F.3d at 106. The court stated that "any expectation of privacy that [the defendant] had in his cellphone location was dubious at best." Id. at 105. But this remark was part of a broader exigency analysis, and the court’s primary justification for it was the lack of decisive authority on the question. See id. at 106 (”[T]he fact that the question of the degree of privacy that adheres to these sorts of information, to date, divides those Circuit courts that have spoken to the issue reinforces the conclusion that the intrusion here was not to an established, core privacy value.”). . Moreover, the factual premise of the government’s argument is erroneous. The events at issue in this case occurred in 2013, and at that time cell-site simulators were relatively unknown to the public. Law-enforcement agencies around the country that acquired the device had been required (and, for all we know, still continue to be required) to sign nondisclosure agreements with the Federal Bureau of Investigation. See Matt Richtel, A Police Gadget Tracks Phones? Shhh! It’s Secret, N.Y. Times, Mar. 15, 2015, https://www. nytimes.com/2015/03/16/business/a-police-gadget-tracks-phones-shhh-its-secret.html; Pell & Soghoian, supra note 2,.at 38. Indeed, amici curiae have provided us with a redacted copy of a nondisclosure agreement that the MPD signed. By signing this agreement, the MPD agreed that, among other things, "the equipment/technology and any information related to its functions, operation, and use shall ... [not be] disclos[ed] ... to the public in any manner including but not limited to: in press releases, in court documents, during judicial hearings, or during other public forums,”. See also Andrews, 134 A.3d at 338 (detailing a similar agreement signed by the Baltimore City Police Department). There is no evidence in the record that Mr. Jones was aware of the government’s secret use of the cell-site simulator and little reason to believe that the public was widely aware of it. . We need not rule on Mr. Jones's alternative argument that the government’s conduct here constituted a search under (Antoine) Jones, 565 U.S. 400, 132 S.Ct. 945, where the court held that a trespass used to obtain information constitutes a Fourth Amendment search. Mr. Jones makes a plausible argument that the government's conduct constituted a trespass to his chattel — that is, that the government "intentionally ... us[ed] or inter-meddled] ” with his chattel, his cellphone. Restatement (Second) of Torts § 217 (Am. Law Inst. 1965). The government, through the cell-site simulator, coopted Mr. Jones’s phone, forcing it to do something Mr. Jones surely never intended it to do: reveal its identifying and location information to an entity other than a telecommunications provider. Moreover, it is a natural consequence of a cell-site simulator's use that it will disrupt the operation of the target phone, and there is reason to believe that this happened here, given the records showing Mr. Jones’s seven failed calls. See supra note 7. And numerous courts have held that computer hacking and interference with electronic resources can satisfy the elements of common-law trespass to chattels. See generally Marjorie A. Shields, Annotation, Applicability of Common-Law Trespass Actions to Electronic Communications, 107 A.L.R.5th 549 (2003). But the question whether the holding of (Antoine) Jones extends beyond physical trespasses is still an open one. It is unclear, first of all, whether the holding of (Antoine) Jones depends on “the law of trespass as it existed at the time of the adoption of the Fourth Amendment” or whether new forms of the tort are relevant, 565 U.S. at 426, 132 S.Ct. 945 (Alito, J., concurring in judgment). Assuming that the former is the case, it is also not clear whether "the[] recent decisions [recognizing electronic trespass to chattels] represent a change in the law or simply the application of the old tort to new situations.” Id. at 426-27, 132 S.Ct. 945 (Alito, J., concurring in judgment). Mr. Jones's counsel pointed out during oral argument that courts recognized forms of nonphysical trespass on chattels long before the electronic age, suggesting a possible answer to the second of these questions. See, e.g., Cole v. Fisher, 11 Mass. 137 (1814) (holding that the plaintiff could sue for trespass to chattels where the sound of the defendant’s gunshot frightened the plaintiff’s horse, resulting in damage to the plaintiff's carriage); see also W. Page Keeton et al., Prosser and Keeton on Torts § 14 n.8 (5th ed. 1984) (citing other cases). Yet we do not have to answer these “vexing” questions today. (Antoine) Jones, 565 U.S. at 426, 132 S.Ct. 945 (Alito, J., concurring in judgment). . Arguing that ‘‘bystanders['3 ... phones [can be] ensnared by the cell site simulator,” see supra notes 12 and 15, amici curiae ask us to adopt a requirement that'"any cell site simulator warrant must include provisions to minimize collection, retention, and use of bystanders' data.” See In re Application of the United States for an Order Relating to Telephones Used by Suppressed, No. 15 M 0021, 2015 WL 6871289, at *3-4 (N.D. Ill. Nov. 9, 2015); In re Search Warrant, 193 Vt. 51, 71 A.3d 1158, 1170 (2012) ("Warrants for electronic surveillance routinely set out ‘minimization’ requirements — procedures for how and under what conditions the'electronic surveillance may be conducted — in order to 'afford similar protections to those that are present in the use of conventional warrants authorizing the seizure of tangible evidence.’ " (quoting Berger v. New York, 388 U.S. 41, 57, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967)) (brackets removed)). The issue of interference with third parties’ phones is not before us in this appeal, however. . Mr. Jones argues that this finding was clearly erroneous.because "[tjhe government presented no expert testimony about the functioning of the cell site simulator, choosing instead to present only lay testimony [by Sergeant Perkins] about how the field operators use the device.” In Mr. Jones's view, "there is no evidence in the record about the failure rate of the cell site simulator or whether it statistically works better with certain models of phones or on certain networks." . In this regard, we note that not only did Mr. Jones concede that he lacked standing to contest a search involving the complainant's phone, but also the record suggests that the complainant consented to the police’s tracking of her phone. See United States v. Johnson, 380 F.3d 1013, 1017 (7th Cir. 2004) (holding that to rely on the inevitable-discovery doctrine the government must prove a lawful means by which it would have obtained the evidence, and that it is insufficient to prove merely that "the evidence would have been discovered as a consequence of [an] illegal search of [a third party], to which [the defendant] could not object”). .The MPD owned another unit, but it was not working properly the day of the search. . Unlike our dissenting colleague, we are not persuaded by the government’s alternative argument that because Mr. Jones was carrying the stolen phones, which could have been located and tracked lawfully (it is assumed), Mr, Jones had no expectation of privacy in his location. This argument was not raised in the initial briefing or in the trial court — it was first raised at oral argument before this court in response to questions from the bench. Although after oral argument we requested supplemental briefing on- this argument, we ultimately conclude that the government’s failure to present it at an earlier stage constitutes a waiver of the argument under the circumstances of this case. See Tuckson v. United States, 77 A.3d 357, 366 (D.C. 2013); Rose v. United States, 629 A.2d 526, 535 (D.C. 1993); see also Greenlaw v. United States, 554 U.S. 237, 244, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008) ("We wait for cases to come to us, and when they do we normally decide only .questions presented by the parties. Counsel almost always know a great deal more about their cases than we do, and this must be particularly true of counsel for the United States, the richest, most powerful, and best represented litigant to appear before us.” (quoting United States v. Samuels, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of rehearing en banc))). In any case, the argument is unpersuasive because, as we have explained above, ”[t]he fact that equivalent information could sometimes be obtained by other means does not make lawful the use of means that violate the Fourth Amendment." Kyllo, 533 U.S. at 35 n.2, 121 S.Ct. 2038; see also Maynard, 615 F.3d at 566. And as amici have cogently argued in their supplemental submission, ”[c]onsidering as part of the reasonable-expectation-of-privacy inquiry the availability of alternative means to gather information would collapse inevitable discovery into the reasonable-expectation question in a manner that would radically transform both doctrines.” As amici explain, were we to adopt the government's — and the dissent’s— novel théóry of affirmance, "the contours of the inevitable discovery doctrine, a carefully crafted exception to the exclusionary rule with strict requirements, would be subject to end-runs, because the possibility of an alternative means of discovery could often be repackaged as a reason to reject an expectation of privacy in the first place” (citation omitted). . The Supreme Court has implicitly foreclosed the government’s argument that police can reasonably conclude from the complete lack of judicial precedent that their conduct is lawful. See Davis, 564 U.S. at 248, 131 S.Ct. 2419 (suggesting that the good-faith exception for police reliance on binding judicial precedent would not apply where “the precedent is distinguishable”). . The government cites United States v. McClain, 444 F.3d 556 (6th Cir. 2006), in which the court declined to apply the exclusionary rule where officers conducted a search pursuant to a warrant based in large part on information that had been illegally gathered. This court's holding in Evans precludes us from following McClain. And in any case, McClain is distinguishable because there the "warrant affidavit fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial [illegal] search,” Id. at 566. Here, by contrast, the police did not disclose in their applications for the warrants and order that they had deployed a cell-site simulator to locate Mr. Jones. Indeed, in the otherwise lengthy affidavit for the warrants, the officers’ search for Mr. Jones is described in a single sentence: "[T]he Defendant was located by members of the Washington, D.C. Metropolitan Police Department ....” The government cannot rely on the Leon good-faith exception when the police have not been "frank with the magistrate in proceedings to obtain the warrant,” United States v. Reilly, 76 F.3d 1271, 1273 (2d Cir.), on reh'g, 91 F.3d 331 (2d Cir. 1996). . In the trial court, Mr. Jones specifically moved to “[s]uppress [¡Identifications, [statements, and [t]angible evidence” resulting from the illegal search. The evidence and testimony that Mr. Jones identifies as fruits of the poisonous tree in this appeal clearly fall within these categories, and the government could not have reasonably doubted that Mr. Jones intended to have them suppressed. The government had a "full and fair opportunity” in the trial court to litigate this matter. Barnett v. United States, 525 A.2d 197, 200 (D.C. 1987). And the record before us is "of amply sufficient detail and depth” to permit us to decide the scope of the exclusionary rule as a matter of law. Brown v. Illinois, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). We thus (except as to the testimony of Ms. Williams, see infra note 41) decline the government's request that we remand the case so that the trial court can “hold hearings, make factual findings of fact, and reach legal conclusions on the application of the fruit-of-the-poisonous-tree doctrine." . . One of the complainants testified at trial about the appearance of Mr. Jones’s genital area, and the photograph of Mr. Jones's groin was admitted in evidence at trial. . United States v. Bowley, 435 F.3d 426, 430-31 (3d Cir. 2006), and United States v. Pineda-Chinchilla, 712 F.2d 942, 943-44 (5th Cir. 1983), cited by the government,. stand only for the narrow proposition that a defendant cannot suppress the contents of his immigration file even if the prosecuting authority's discovery-of that file or its connection to the defendant was based on evidence gathered in an illegal search or seizure, Thus, even if we were to find these cases persuasive, but see 6 LaFave, supra, § 11.4 & n.22, they would not support the proposition that a defendant must always — or even usually--have standing,in a particular item of evidence to have it suppressed as a fruit of an illegal search or seizure. . The proper inquiry here is not whether Ms. . Williams’s consent was a valid waiver of her own rights, but rather whether it constituted an intervening circumstance sufficient to purge the taint of the illegal search. Thus, we need not decide whether Ms. Williams could have had the evidence excluded had she herself been tried. See generally 4 LaFave, supra, § 8,2 (c) (discussing Fourth Amendment cases in which “the police have obtained consent to search after threatening that if consent were not given they would proceed to seek or obtain a search warrant”). . But see supra text accompanying note 33. . The government contends that even if the cellphones in Ms. Williams’s purse are fruits of .the poisonous tree, the "call detail records and location information obtained from the provider” for the cellphones “are not subject to exclusion.” Mr. Jones has not argued otherwise, and we see no reason for classifying this information as fruit of the poisonous tree. The government also represents in its brief that "the government received an unsolicited offender hit from the FBI’s Combined DNA Index System (‘CODIS’) indicating that a sample obtained from [Mr, Jones] in connection with [a] prior Maryland conviction matches the crime scene sample obtained in this case,” Assuming that the government Can demonstrate this in the trial court, we agree with the government that it "should not be precluded from seeking another buccal swab [from Mr, Jones] based on the independent and' untainted CODIS hit,” This CODIS hit would not be a fruit, of the illegal ■ search. ; This part does riot constitute the opinion of the court, as it is not joined by Associate Judge Thompson or Senior Judge Farrell, . To be entirely accurate, we have reached this conclusion with respect to all of the purported fruits except for the testimony of Ms. Williams. See supra note 41. The conclusion that the error was not harmless beyond a reasonable doubt nonetheless stands.